VERNON J. ROCKLER & CO., INC., Appellant,

v.

GLICKMAN, ISENBERG, LURIE & CO., et al., Respondents.

No. 47850.

Supreme Court of Minnesota.

Dec. 8, 1978.

---

Dorfman, Katz, Taube, Lange & Davis and Steven C. Davis, Minneapolis, for appellant.

Richards, Montgomery, Cobb & Bassford and L. Hamilton May, Jr., Minneapolis, for respondents.

Heard before ROGOSHESKE, PETERSON and SCOTT, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

This is an appeal from an order and judgment in favor of defendants and from an order denying plaintiff's motion for a new trial or a reopening of evidence.

Plaintiff, a closely held corporation, is registered as a broker-dealer in securities with the Securities Exchange Commission and is licensed by the State of Minnesota. Defendant Glickman, Lurie, Eiger & Co.[1] is a partnership comprised of certified public accountants engaged in the business of providing accounting, auditing, business planning, and tax planning services to the public, and has provided such services to plaintiff from 1961 to 1972.

Beginning in 1962 plaintiff maintained an investment account for which it purchased

---

1. Defendant Glickman, Isenberg, Lurie & Co. is the predecessor of defendant Glickman, Lurie, Eiger & Co.

securities to be held as capital assets. These securities were segregated from those held in its inventory account for sale to customers in the ordinary course of business. Plaintiff reported profits' realized from the sale of securities held in its investment account for more than 6 months at capital gains rates for income tax purposes. Plaintiff also maintained an inventory account through which it transacted approximately 95 percent of its business. Plaintiff maintained a separate inventory account for securities sold but not yet purchased. Such transactions are referred to by the parties as "short sales."[2] Plaintiff hoped it would be able to purchase securities for this account in the marketplace for less than plaintiff had sold them. When plaintiff was able to do so, it realized gains; if it had to purchase the securities at a higher price, it suffered a loss. Plaintiff had lost considerable amounts on "short sales" at least three times between 1961 and 1967. Plaintiff reported all gains and losses from transactions in securities held in these accounts at ordinary income tax rates.

During the time in issue, plaintiff held many of the same securities in its investment account that it was selling short. Because of the rising market in many of these securities, plaintiff was in danger of losing money on its "short sales." Hence, plaintiff considered the possibility of transferring securities from its investment account to its inventory account to cover its short sales. Plaintiff's president, Vernon Rockler, claims he spoke with Mr. Serber of defendant firm concerning such transfers and their income tax effect some months prior to the end of the fiscal year ending June 30, 1968. Mr. Rockler testified that Mr. Serber advised him to transfer the securities by means of a general bookkeeping entry which would preserve their capital gains treatment. Mr. Serber denied that this conversation ever occurred.

In May or June 1968 Mr. Rockler directed plaintiff's bookkeeper to make general bookkeeping entries transferring certain securities from the investment account to the inventory account. When defendants audited plaintiff's books in the summer of 1968 in preparing plaintiff's income tax return, defendants relied on the schedules prepared by plaintiff and did not challenge such transfers.

In December 1968 Mr. Rockler met with Mr. Ephraim of defendant firm to discuss the possibility of "borrowing" securities which had not been held for 6 months from the investment account to cover certain "short sales." Mr. Ephraim told him there was no way to "borrow" such securities and maintain their capital asset status. He did advise Mr. Rockler that pursuant to Internal Revenue Code, 26 U.S.C.A. § 1236, there were two ways to preserve capital gains treatment—by direct sale from the investment account to the open market and by a general journal entry transferring securities from the investment account to the inventory account. He testified at trial:

"THE WITNESS: Well, my answer to it would be that I would have to know how long, or I would have to see what happened to the stocks that were then transferred into inventory. If the stocks were transferred into inventory and then right out on to the street, that would be one thing.

"BY MR. DAVIS:

"Q. Would that be okay?

"A. Yes, I think that would be okay. But that is just my thinking on it.

"Q. And that would not violate Section 1236 A–2, in your opinion?

"A. Yes, sir, that is correct; and they went directly out.

"Q. And they went directly out. You mean by that, suppose they went out against an account such as securities sold but not yet purchased?

2. "Short sales" were defined in *Provost v. United States*, 269 U.S. 443, 450, 46 S.Ct. 152, 153, 70 L.Ed. 352, 354 (1926), as follows: "As the phrase indicates, a short sale is a contract for the sale of shares which the seller does not own

or the certificates for which are not in his control so as to be available for delivery at the time when, under the rules of the Exchange, delivery must be made."

"A. Well, as long as they weren't thereafter held.

"Q. In inventory?

"A. In inventory. If they went from the investment account to the inventory account to the street, I wouldn't like it as well as if they had gone directly to the street; but I would think that would be all right.

"Q. But that is in fact, exactly what you told Mr. Rockler in December of 1968, isn't it?

"A. Yes, I would think that probably is what I told Mr. Rockler. However, I would tell him that he has a very safe way of doing it, and that's to go directly to the street. But if he chooses to go through his inventory account, I just don't know what the results are going to be. I do know what the results are going to be if he goes directly to the street."

Between December 1968 and June 1969 plaintiff made numerous transfers from its investment account to its inventory account. Defendants audited plaintiff's records in the summer of 1969 in preparing plaintiff's income tax return. Defendants relied on schedules prepared by plaintiff and did not challenge these transfers.

In 1971 the Internal Revenue Service audited plaintiff's 1969 income tax return. The IRS disallowed capital gains treatment of these transfers and assessed a deficiency. Upon the advice of Walter Rockler, a tax attorney, plaintiff negotiated with the IRS and eventually settled the deficiency by paying capital gains tax rates on one-half the gain and ordinary income tax rates on the other half.

Plaintiff then brought suit against defendants to recover the amount of the deficiency assessment, interest and penalties, and for reimbursement of attorneys fees and costs incurred in protesting and settling the deficiency. The trial court found that the advice given by defendants did not constitute professional malpractice; that it did not warrant action in reliance thereon by plaintiff; that plaintiff did not actually rely on such advice; that plaintiff made the transfers because of the need to cover its "short sales" not because of defendants' advice; and that plaintiff had failed to establish its damages because it settled with the IRS.

■ The sole issue in this case is whether these findings are clearly erroneous. Under Rule 52.01, Rules of Civil Procedure, factual findings can be held clearly erroneous only if upon a review of the entire evidence we are left with the definite and firm conviction that a mistake has been made. *In re Trust known as Great Northern Iron Ore Properties*, 308 Minn. 221, 225, 243 N.W.2d 302, 305 (1976); *In re Estate of Balafas*, 293 Minn. 94, 96, 198 N.W.2d 260, 261 (1972).

■ Accountants are held to the same standard of reasonable care as lawyers, doctors, architects, and other professional people engaged in furnishing skilled services for compensation. *Gammel v. Ernst & Ernst*, 245 Minn. 249, 253, 72 N.W.2d 364, 367 (1955). Plaintiff in an accounting malpractice action must prove the elements delineated for a legal malpractice action in *Christy v. Saliterman*, 288 Minn. 144, 150, 179 N.W.2d 288, 293 (1970). Thus, to recover in this case plaintiff would need to prove a duty (the existence of an accountant-client relationship), the breach of that duty (the failure of the accountants to discharge their duty of reasonable care), factual causation (that "but for" the advice plaintiff would not have made transfers), proximate causation (that plaintiff's increased tax liability was a foreseeable consequence of defendants' advice), and damages (that plaintiff actually suffered increased tax liability due to defendants' advice). The trial court specifically relied on *Christy v. Saliterman, supra*, in making its findings and, therefore, did not apply the wrong legal standard. The trial court's finding on reliance was merely another way to discuss the element of factual causation.

■ Accountants owe their clients a duty of reasonable care; they must exercise the average ability and skill of those engaged in that profession. *Gammel v. Ernst & Ernst, supra; City of Grand Forks v. Steele*, 121 Minn. 296, 300, 141 N.W. 181, 182 (1913).

The trial court found that the advice given was not a "clear-cut statement of advice such as to constitute professional malpractice." Mr. Ephraim's advice to plaintiff was based primarily on 26 U.S.C.A. § 1236, of the Internal Revenue Code, which was enacted to prevent broker-dealers from shifting securities from one account to another to obtain the most favorable tax treatment possible. The only way for a broker-dealer to obtain capital gains treatment under this section is to segregate securities in an investment account and never hold that security for sale to customers in the ordinary course of business. Both plaintiff's experts testified that in their opinion transferring securities by bookkeeping entry did not comply with this section and that by doing so plaintiff lost capital gains treatment of the transferred securities. These experts testified that a tax advisor who permitted his client to make such transfers in hope of obtaining capital gains treatment failed to discharge his duty of reasonable care to that client.

Defendants' expert testified that defendants had discharged their duty of reasonable care. He based his opinion on both § 1236 and § 1233 of the Internal Revenue Code, 26 U.S.C.A. §§ 1233, 1236. Section 1233 and Treas. Reg. 1.1233(a)(2) provide that a broker-dealer can realize capital gains on "short sales" if he uses securities which are capital assets. The only way to do this is to use securities held in the investment account. One of plaintiff's expert witnesses admitted that this regulation altered his opinion, if it applied. Mr. Ephraim also testified that in his opinion § 1236 did not preclude capital gains treatment of these transfers, because plaintiff never held these securities for sale to customers in the ordinary course of business. The transferred securities were used immediately to cover the "short sales"; they were never "held" in the inventory account.

In addition, the Transmittal Report of the IRS audit agent and the District Conference Report describe the IRS' belief that plaintiff actually held the securities in issue for sale to customers in the ordinary course of business even though plaintiff technically held them in its investment account. Thus, the IRS considered the bookkeeping transfers irrelevant in deciding to tax these transactions at ordinary income tax rates. Plaintiff's experts implied that it would have been better for plaintiff to have sold the securities in question in the open market directly from the investment account and then repurchase them to cover the "short sales." The IRS did not believe that this method would necessarily insure capital gains treatment because it maintained that plaintiff had held the securities for sale to customers in the ordinary course of business even though they were held in the investment account.

Given this testimony, the documents, and the absence of any controlling authority under § 1236, the trial court's finding that defendants' advice did not constitute professional malpractice is not clearly erroneous.

The trial court also found that Mr. Ephraim's advice to Mr. Rockler in December 1968 was "nothing more than an expert opinion and not such as to warrant reliance thereon by plaintiff broker." Given Mr. Rockler's experience, the trial court found "it difficult to believe that plaintiff, Rockler, reasonably relied on the advice given, inconclusive and ambiguous as it was." In addition, the trial court found that plaintiff's decision to make the transfers from the investment account to the inventory account was caused by its need to cover its "short sales" not by defendants' advice.

The essence of the trial court's finding was that plaintiff did not rely on the advice, because there was an independent business reason for transferring these securities. The evidence, both oral and written, amply supports this conclusion. Plaintiff made similar transfers prior to the end of fiscal year 1968. Although plaintiff claims defendants advised it to make such transfers, defendants deny giving plaintiff such advice. In addition, plaintiff met with Mr. Ephraim on December 11, 1968, to discuss the possibility of "borrowing" securities which had been held for less than 6 months

from its investment account not to seek advice on transferring securities which had already been held for 6 months. Only after Mr. Ephraim explained § 1236 did plaintiff question Mr. Ephraim about the consequences of such transfers.

The IRS Transmittal Report and District Conference Report indicated the IRS' belief that plaintiff used its investment account to protect against losses resulting from selling securities it had not yet purchased. This occurred because plaintiff did not always need to deliver the securities involved for a period of months. Therefore, at the same time plaintiff sold a security it had not yet purchased, it bought the same security for its investment account. If it was able to hold the security for 6 months in its investment account, it could obtain capital gains treatment when it sold that security. Because some of the securities became unobtainable, such as the securities of Ivey Corporation, or only obtainable at much higher prices than plaintiff anticipated, plaintiff had no choice but to transfer the securities from its investment account to its inventory account to cover its "short sales." Failure to do this might have subjected plaintiff to large losses on its "short sales" or to the loss of its registration and license as a broker-dealer. Thus, even if the defendants had advised plaintiff to sell the securities in the open market and then repurchase them, plaintiff would not necessarily have followed such advice. The IRS determined that plaintiff held these securities for sale to customers in the ordinary course of business, because plaintiff's securities-sold-but-not-yet-purchased account was short throughout the taxable year in these securities, a window board in plaintiff's window indicated that plaintiff was a market maker in many of these securities, and plaintiff no longer traded in many of these securities when its investment account was depleted following the transfers to its inventory account.

Given the documentary and oral evidence, the trial court was justified in finding that plaintiff did not rely on defendants' advice and that such advice was not the factual cause of plaintiff's loss. To affirm the trial court it is only necessary to hold that neither finding discussed above is clearly erroneous. Because we uphold the trial court on these grounds, we do not need to reach plaintiff's other contentions.

Affirmed.