**Julia A. CHRISTIANS, Trustee for the Bankruptcy Estate of Technimar Industries, Inc., Appellant,**

v.

**GRANT THORNTON, LLP, Respondent.**

No. A06–1309.

Court of Appeals of Minnesota.

July 3, 2007.

Gordon B. Conn, Jr., Kalina, Wills, Gisvold & Clark, P.L.L.P., Minneapolis, MN, for appellant.

Michael E. Keyes, Katherine M. Wilhoit, Heidi A.O. Fisher, Mark P. Schneebeck, Oppenheimer Wolff & Donnelly LLP, Minneapolis, MN, for respondent.

Considered and decided by LANSING, Presiding Judge; HALBROOKS, Judge; and HUDSON, Judge.

## OPINION

LANSING, Judge.

Julia Christians, in her capacity as the bankruptcy trustee for Technimar Industries, Inc., appeals the district court's summary judgment dismissing her auditor-malpractice and breach-of-contract claims against Grant Thornton, LLP. The district court based its order on the trustee's failure to provide sufficient evidence of causation, the trustee's failure to demonstrate that the damages were sustained by the corporation rather than the corporation's creditors, and the application of the equitable doctrine of in pari delicto. Although we conclude that the record contains sufficient evidence to show that Grant Thornton caused a fractional amount of the claimed damages, we also conclude that the district court acted within its discretion by applying the in pari delicto doctrine to bar the trustee's claims because Technimar bears at least substantially equal responsibility for the injury that its trustee in bankruptcy seeks to remedy. Therefore, we affirm.

## FACTS

Technimar Industries, Inc., is a defunct Delaware corporation that was organized by Roberto Contreras, Sr., and his sons Roberto Contreras, Jr., and Luis Contreras. The elder Contreras acted as Chairman of the Board of Directors, President, and Chief Executive Officer. The junior Contreras acted as the Vice President of Operations and served on the board. Luis Contreras acted as Treasurer, Secretary, Administrative Vice President, and also served on the board.

In July 1994 Technimar entered into an exclusive license agreement with an Italian company, Breton S.p.A., to purchase, for $16 million, equipment necessary for the manufacture of an agglomerated stone product known as "Stonite." To raise the necessary capital Technimar retained the services of David Welliver and Rothschild Capital Corporation. Welliver raised approximately $13 million through private debt and security offerings in early 1996, which Technimar used to begin construction of a manufacturing plant in Cohasset, Minnesota, and also used to make payments on the Breton contract. The Minneapolis police and firemen's pension funds were substantial investors.

Welliver made arrangements for a bond issuance in 1996 because Technimar needed additional capital to pay $8.4 million remaining on the Breton contract. The City of Cohasset agreed to issue a $12 million industrial-revenue bond on Technimar's behalf and to assign the bond to Heller Financial. Heller required a guaranty for the bond. Cohasset agreed to provide $2.4 million, and the Iron Range Resources Rehabilitation Board agreed to provide $2 million. Through a complex financing arrangement devised in Italy in September 1996, Rothschild Venture & Growth, L.P. (RVG) (previously known as Valent Venture & Growth, L.P.) agreed to provide the remaining $7.6 million. Breton essentially underwrote RVG's commitment by agreeing to wire RVG $7.6 million of the $8.4 million it would receive from Technimar, in exchange for a corresponding amount of shares in the Valent Fund. Immediately thereafter, Technimar was to purchase $4 million of Breton's position in the Valent Fund, and RVG was to redeem Breton's remaining $3.6 million investment in the Valent Fund over a period of several months.

The Technimar board ratified the September 1996 agreement in a meeting that same month. Before the bond closing, however, Breton, RVG, and Contreras, Sr., entered into a separate agreement restructuring the buyout of Breton's Valent Fund investment. In this December 1996 agreement, Technimar agreed to redeem Breton's entire Valent Fund investment over a period of several months. Shipment of the equipment was divided into phases corresponding with these payments. Technimar's board did not ratify this separate agreement. The bond sale closed at the end of December 1996.

Technimar retained Grant Thornton to audit its 1996 financial statements. As part of its preparation for the audit, Grant Thornton requested all relevant documents relating to the equipment-purchase agreement. Contreras, Sr., executed a letter attesting to Technimar's full delivery of all "[f]inancial records and related data" requested by Grant Thornton. Grant Thornton's audit file included the minutes for the September 1996 Technimar board meeting but did not contain either the September or the December agreements with Breton and RVG. Nonetheless, Grant Thornton's work papers reflected its awareness that Technimar was making payments to Breton. Grant Thornton asked Luis Contreras about the payments and was told that Technimar was replacing Breton as guarantor on the bond. As a result of these and other representations, Grant Thornton produced, in April 1997, audited financial statements that showed a $16 million deposit on the Breton equipment. The financial statements did not reflect Technimar's *obligation* to purchase the Valent Fund investment from Breton and replace Breton as guarantor. Consequently, Technimar appeared solvent when it was, in fact, not.

Between April 1997 and December 1997, the Minneapolis Police Relief Association lent Technimar an additional $8 million. Technimar used this money to continue its operations, including construction of the Cohasset plant, and to purchase Breton's Valent Fund shares. Technimar defaulted on the Heller bonds in December 1997, and Heller foreclosed. In July 1998 Technimar filed for Chapter 11 bankruptcy protection. In March 1999 the Chapter 11 reorganization was converted to a Chapter 7 liquidation.

The trustee brought this action against Grant Thornton in March 2003, alleging, primarily, auditor malpractice and breach of contract. Among the claimed damages, the trustee asserted that Technimar was harmed by the deepening insolvency that

resulted from Grant Thornton's erroneous audited financial statements. Grant Thornton moved for summary judgment, and the district court granted the motion. In relevant part, the court found that a claim for deepening-insolvency damages belongs to a corporation's creditors rather than its bankruptcy trustee and that the trustee did not sufficiently demonstrate that any claimed loss was caused by Grant Thornton's conduct. The court also found that the trustee's claims were barred under the doctrine of in pari delicto because Technimar was at least equally at fault for the misleading financial statements. This appeal follows.

## ISSUES

I.  Did the district court properly grant summary judgment on the trustee's claims in favor of Grant Thornton?

A.  Did the trustee support her claims with sufficient damages evidence?

B.  Did the trustee support her claims with sufficient causation evidence?

II.  Did the district court abuse its discretion in holding that the trustee's claims were barred by the equitable doctrine of in pari delicto?

## ANALYSIS

### I

■ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to judgment as a matter of law." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). To raise a genuine issue of material fact the nonmoving party need not introduce substantial evidence; sufficient evidence is all that is required. *Schroeder v. St. Louis County,* 708 N.W.2d

497, 507 (Minn.2006). But evidence that only raises "a metaphysical doubt as to a factual issue and that is not sufficiently probative with respect to an essential element of [the nonmoving party's] case to permit reasonable people to draw different conclusions" will not meet this standard. *State Farm Fire & Cas. v. Aquila Inc.,* 718 N.W.2d 879, 886–87 (Minn.2006). On review we evaluate whether the evidence, taken in a light most favorable to the nonmoving party and with all factual inferences drawn in favor of the nonmoving party, presents a genuine issue of material fact. *Wartnick v. Moss & Barnett,* 490 N.W.2d 108, 112 (Minn.1992). We also independently determine whether the district court properly applied the law. *Id.*

■ To prevail in an action for auditor malpractice or breach of contract, the plaintiff must prove the existence of a duty or contract, breach of that duty or contract, factual and proximate causation, and damages. *Vernon J. Rockler & Co. v. Glickman, Isenberg, Lurie & Co.,* 273 N.W.2d 647, 650 (Minn.1978) (setting forth elements for auditor-malpractice claim); *Rubbelke v. Mabley,* 410 N.W.2d 880, 883 (Minn.App.1987) (combining elements of legal-malpractice and breach-of-contract claims).

In granting summary judgment against the trustee's claims, the district court concluded that the trustee had presented sufficient evidence on the elements of duty and breach but failed to provide adequate evidence on the elements of damages and causation. The trustee disputes this conclusion and contends that she has provided adequate evidence in the form of affidavits, depositions, and answers to interrogatories and that the evidence supports her theory of "deepening-insolvency" damages. We turn first to the issue of damages and then to the issue of causation.

## A. Evidence of Damages

The district court held that the trustee's claim was flawed because she did not present any evidence of damage to Technimar. Because Technimar was insolvent at the time of the alleged wrongdoing, the court reasoned that "[t]he creditors suffered the injury, not Technimar," therefore the claim "more appropriately belonged to [Technimar's] creditors." In essence, the court determined that the trustee lacked standing to pursue the claim.

■ At the outset, we observe that because Technimar was incorporated in the state of Delaware, the laws of both Delaware and Minnesota are relevant to this case. The first step in our conflict-of-law analysis, however, requires us to determine whether there is an actual conflict of law on the issue of trustee standing. *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn.1994). We see no basis for concluding that Minnesota's law is in actual conflict with Delaware's law on this issue. Because Delaware's law on trustee standing is more clearly developed, we will, as a matter of judicial convenience, refer to Delaware cases.

■ The notion that harm to an insolvent corporation produces a direct creditor claim stems from the trust-fund doctrine. The trust-fund doctrine holds that when a corporation enters insolvency, the corporation's officers and directors no longer owe a fiduciary duty to the shareholders, but to the creditors. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 791 (Del. Ch.2004). The underlying rationale is that, because an insolvent corporation has no shareholder equity, the creditors are the only remaining stakeholders with an interest in the corporation. *Id.* The corporate assets are therefore held in "trust" for the creditors. Because any subsequent corporate injury is borne solely by the creditors, the claim is arguably held by the creditors and not the corporation.

■ Delaware, which recognizes the trust-fund doctrine, nonetheless rejects the direct-creditor-claim theory. Delaware courts have held that while "creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties," they "have no right to assert direct claims." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, No. 521,2006, 2007 WL 1453705, at *7–8 (Del. May 18, 2007) (emphasis omitted). In *Production Resources*, the court reasoned that "even in the case of an insolvent firm, poor decisions by directors that lead to a loss of corporate assets and are alleged to be breaches of equitable fiduciary duties remain harms to the corporate entity itself." *Prod. Res. Group*, 863 A.2d at 792. The court explained that, "At all times, claims of this kind belong to the corporation itself because even if the improper acts occur when the firm is insolvent, they operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm." *Id.* at 776; *see also Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1004–06 (9th Cir.2005) (holding that traditional corporate harms to insolvent corporation are properly raised by bankruptcy trustee).

■ Although the conduct alleged to be improper in this case were actions of outside auditors rather than corporate officers, they purportedly reduced the firm's value just the same. Thus, any resulting claim would belong to the corporation. Accordingly, the trustee has standing to pursue the claim.

### Deepening–Insolvency Damages

We next address the trustee's claim that Technimar was damaged by the deepening

of its insolvency. The trustee asserts that Technimar was harmed by becoming more insolvent than it would have been absent Grant Thornton's alleged wrongdoing. Before considering whether the trustee produced sufficient evidence of this claim, we must consider whether Minnesota law recognizes deepening insolvency as a theory of damages. We hold that it does not.

Deepening insolvency has its origins in the doctrine of in pari delicto. In pari delicto operates to bar suits between two wrongdoers who are at equal fault. *State by Head v. AAMCO Automatic Transmissions, Inc.,* 293 Minn. 342, 347, 199 N.W.2d 444, 448 (1972). In the corporate context, when the inequitable actions of officers and directors are imputed to the corporation, the doctrine bars suits brought on the corporation's behalf if the officers and directors (1) acted in their employment capacity and (2) for at least the partial benefit of the corporation. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 358–59 (3d Cir.2001). The "adverse interest" exception prevents imputation, however, if the individual's conduct provides *no* benefit to the corporation. Restatement (Second) of Agency § 228(1) (1958). To determine whether a corporate insider's decision to burden the corporation with wrongfully incurred and unpayable debt could be imputed to the insolvent corporation, the Seventh Circuit considered whether the resulting extension of the corporation's life was beneficial. *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.1983). The court held that the mere prolongation of a corporation's life did not necessarily equate to a corporate benefit because "the corporate body is ineluctably damaged by the *deepening of its insolvency,* through increased exposure to creditor liability." *Id.* (emphasis added).

Deepening insolvency has since permutated into an independent measure of damages, and, in that form, has been recognized by several jurisdictions. *Liquidating Trustee of Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.),* Ch. 11 Case No. 04–40504, Adv. No. 05–3515, 2007 WL 777704 (Bankr.S.D.Ohio 2007); *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I),* 353 B.R. 324 (Bankr.D.Colo.2006); *Amato v. Sw. Fla. Heart Group, P.A. (In re Sw. Fla. Heart Group, P.A.),* 346 B.R. 897 (Bankr.M.D.Fla.2006); *Allard v. Arthur Andersen & Co.,* 924 F.Supp. 488 (S.D.N.Y.1996). The concept presumes that, in taking on additional unpayable debt, a corporation might be harmed by operational limitations, strained corporate relationships, diminution of corporate assets, and the legal and administrative costs of bankruptcy. *R.F. Lafferty,* 267 F.3d at 349–350.

The trustee argues that Minnesota courts have already recognized deepening-insolvency damages in *Bonhiver v. Graff,* 311 Minn. 111, 131, 248 N.W.2d 291, 303 (1976). But *Bonhiver* is distinguishable because it addressed damages that an insolvent corporation suffered as a result of embezzlement that would have been prevented but for an accountant's negligence. *Id.* The damages incurred were the result of an additional illegal act rather than the mere continuation of the corporation's existence. Thus, the case does not endorse deepening insolvency as a measure of damages. Instead, the case suggests that deepening-insolvency damages are superfluous because traditional-damages measures are sufficient for assessing injuries to insolvent corporations.

That rationale is confirmed and expanded in a frequently cited article by Sabin Willet, analyzing the theory of deepening-insolvency damages. *The Shallows of*

*Deepening Insolvency*, 60 Bus. Lawyer 549 (2005). Willet explains that additional debt will never harm a corporation because loans are balance-sheet neutral; every addition to a corporation's liabilities is offset by an equal addition to the corporation's assets. *Id.* at 554–55. After dismissing the "damages" identified in *Lafferty*, Willet concludes that:

> [I]njury to solvency is an incident to the harm, not the harm itself. If the [corporation] lost asset value through defendant's conversion of property, the law measures damage; if through breach of contract, commission of tort, breach of fiduciary duty, or fraudulent transfer, the law already measures damage. The damages may include the insult to asset values ... or the accumulation of a liability.... Depending on the underlying law, the damage may or may not also include lost profits.... Solvency analysis will be incidental to all of these damage analyses. It may so happen that the diminished asset value, new liability, or lost profits that measures the damage also measures precisely the deepening of the firm's insolvency. *The point is that insolvency analysis adds nothing to the measure of damages the law already allows.*

*Id.* at 571–72 (emphasis added).

Willet's reasoning has been adopted by several jurisdictions in the course of rejecting deepening-insolvency damages. *Seitz v. Detweiler, Hershey & Assocs. (In re CitX Corp.)*, 448 F.3d 672, 677 (3d Cir. 2006) (holding that under Pennsylvania law deepening insolvency "should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice"); *Commercial Fin. Servs., Inc. v. J.P. Morgan Sec., Inc.*, 152 P.3d 897, 900 (Okla.Civ.App.2006) (rejecting deepening-insolvency damages under Okla-

homa law), *cert. denied* (Okla. Jan. 16, 2007).

Even those jurisdictions that have supported deepening-insolvency damages have done so only in theoretical terms, on motions to dismiss, or on motions for summary judgment. *In re Amcast*, 2007 WL 777704, at *20 n. 19 (allowing that deepening-insolvency "concept may be useful as a measure of damages" after rejecting concept as independent cause of action on motion to dismiss); *In re Greater Se. Cmty. Hosp.*, 353 B.R. at 338 (accepting deepening-insolvency damages at motion-to-dismiss stage); *In re Sw. Fla. Heart Group*, 346 B.R. at 898 (indicating—in course of granting summary judgment—that deepening insolvency is measure of damages only); *Allard*, 924 F.Supp. at 494 (declining to grant summary judgment when plaintiff claimed deepening-insolvency damages). One court's offered calculation for deepening-insolvency damages equates to nothing more than an amalgamation of traditional damages. *In re Greater Se. Cmty. Hosp.*, 353 B.R. at 338 n. 12 (explaining that plaintiff would need to quantify costs of bankruptcy, lost profitability, and diminution of assets).

We are persuaded that permitting deepening-insolvency damages would needlessly replicate and consequently confuse the current measure of damages for auditor-malpractice actions. Once the deepening-insolvency theory is stripped of the additional-loans component, we are unable to discern what recoverable harms the concept captures that the ordinary measures of damages in auditor-malpractice and breach-of-contract claims do not. *See Olson, Clough & Straumann, CPA's v. Trayne Props., Inc.*, 392 N.W.2d 2, 4 (Minn.App.1986) (allowing corporation to bring claim for lost profits in accountant-malpractice action); J.B. Heaton, *Deepening Insolvency*, 30 J. Corp. L. 465, 483–84

(2005) (observing that "if professionals are negligent in providing services to a corporation, then the corporation can recover for out-of-pocket expenses paid for negligent work and declines in the value of corporate property associated with the negligence"). We therefore hold that deepening insolvency is not a recognized form of corporate damage in Minnesota.

### *Auditor–Malpractice Damages*

Having resolved the questions of standing and deepening-insolvency damages, our inquiry now turns to whether the trustee introduced sufficient evidence of recognized auditor-malpractice damages: auditor's fees, asset diminution, and lost profits. The trustee's evidence consists of answers to interrogatories, claiming as damages approximately $22,000 in auditor's fees and an assortment of loans, expenses, and losses. Aside from the auditor's fees, the claims are improper, duplicative, and, ultimately, unsupported.

The trustee claims as damages additional loans received from the Minneapolis Police Relief Association and increases in current liabilities. But additional debt does not produce injury because it is balance-sheet neutral. The trustee also claims as damages (1) net losses of $14 million in 1997 and $5.2 million in 1998; (2) a loss of $1.25 million from the forced sale of an operating subsidiary; (3) $5 million in Chapter 11 administration expenses; and (4) a loss of $12 million on the equipment contract. These claims are duplicative because the losses of $14 million and $5.2 million encapsulate the net effect of all losses and gains in the given year. Finally, the trustee requests, "Possibly lost profits ... if it can be determined that a successful reorganization under Chapter 11 would have been feasible had the case

been filed shortly after receipt of accurate audited financial statements in 1997."

The difficulty with the trustee's final claim is her failure to provide *any* evidence of what financial outcome would have flowed from a successful Chapter 11 reorganization, or any other set of circumstances. Technimar's financial situation was unquestionably perilous at the time of the allegedly improper audit, thus it is unclear that the revelation of that fact would have necessarily improved Technimar's fortunes. Without a reasonable prediction of what Technimar's financial results would have been but for Grant Thornton's alleged malpractice, the trustee's claims are too remote or speculative. *Trayne*, 392 N.W.2d at 4; *see also MCI Comm. Corp. v. AT & T Co.*, 708 F.2d 1081, 1162 (7th Cir.1983) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage."). As a result, the trustee has failed to produce evidence that would permit reasonable jurors to reach a nonspeculative conclusion about damages and summary judgment was properly granted.

### B. *Evidence of Factual Causation*

The trustee's nonauditor's fees claims also lack adequate evidence of factual causation. Simply stated, factual causation is the "but for" test. *Rockler*, 273 N.W.2d at 650. The test examines whether "but for defendant's conduct the plaintiff would" have avoided the injury alleged. *Blue Water Corp., Inc. v. O'Toole*, 336 N.W.2d 279, 281 (Minn.1983).

When applying the "but for" test, we must envision what would have occurred but for the negligent conduct. In the standard personal-tort case the inquiry is straight-forward: the plaintiff is unin-

jured and whole. In the professional-malpractice case, however, the inquiry is more complex. In *Blue Water,* the plaintiff alleged that an attorney's failure to file an application in time constituted malpractice, and the supreme court held that the plaintiff had to show that the application would have been accepted. *Id.* at 282. And in *Jerry's Enterprises, Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.,* the supreme court required another legal-malpractice plaintiff to show that it would have cleared title to land in a flawed real-estate transaction. 711 N.W.2d 811, 819–20 (Minn.2006). Accordingly, the trustee needed to introduce concrete evidence of what Technimar would have done but for Grant Thornton's negligence and what those actions would have reasonably produced.

The trustee argues that she provided causation evidence in the form of deposition testimony given by Technimar directors and others. The trustee directs our attention to statements that, had they known about Technimar's insolvency, (1) a Minneapolis Police Relief Association representative would have taken "action" earlier, and (2) a Technimar director would have "done everything [he] could to get it rectified." The trustee then posits that major creditors could have forced management change or triggered work-out discussions earlier, or bankruptcy protection could have been obtained while the chance for success still existed. Certainly, many positive things *could* have occurred but for Grant Thornton's alleged negligence, but these speculative potential outcomes are the problem with the causation element rather than the answer to it.

In assessing what the outcome would have been had a corporation's insolvency been properly revealed, we see no concrete evidence that the outcome would have been any better. In fact, some view the concealment of a corporation's insolvency as a benefit rather than a harm. *See In re CitX Corp.,* 448 F.3d at 677–78 (holding that additional equity received because of concealed insolvency was opportunity squandered by corporation's management). While that is a stark view, it nonetheless highlights the dilemma. Corporations are managed by officers and directors who make thousands of decisions in the course of managing, and we recognize the necessity for this independent decision-making by protecting it under the business-judgment rule. *Janssen v. Best & Flanagan,* 662 N.W.2d 876, 881–82 (Minn.2003) (discussing business-judgment rule). And, as the trustee points out, these managers have a range of options available to save or revive a struggling company. Given these two realities, the trustee must untangle the multiple decisions that result in a single net-loss figure and explain how that figure would have changed "but for" some alleged negligence.

The trustee was not able to produce sufficient causation evidence. Instead, the trustee broadly asserts that "action" would have been taken and problems would have been "rectified," while resting on the presumption that those efforts would have resulted in a more beneficial outcome. Even when taken in a light most favorable to the trustee, and drawing every inference in favor of the trustee, these statements cannot defeat a motion for summary judgment.

The trustee has standing to bring a claim for auditor-malpractice and breach-of-contract, but the great majority of her damages claims fail because they are either unrecognized at law in Minnesota, too speculative, or not demonstrably the reasonable effects of Grant Thornton's alleged negligence. Therefore, the only portion of the trustee's claim remaining is the claim for auditor's fees.

## II

The trustee argues that the district court also erred in holding that her claims were barred by the doctrine of in pari delicto. As stated earlier, the doctrine operates to prevent wrongdoers at equal fault from recovering against one another and "is based upon judicial reluctance to intervene in disputes between [wrongdoing] parties." *AAMCO*, 293 Minn. at 347, 199 N.W.2d at 448. One purpose of the doctrine "is to prevent the courts from getting thrust into the position of finding facts where the parties have devised a scheme to deceive outsiders." *Long v. Smead Mfg. Co.*, 383 N.W.2d 452, 455 (Minn.App.1986), *review denied* (Minn. May 29, 1986). Because in pari delicto is an equitable doctrine, we review its application for an abuse of discretion. *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 450 (Minn.App.2001).

The trustee argues that the district court abused its discretion because the facts do not support a fraud claim and that any alleged fraud was not sufficiently "massive." But application of the doctrine does not require a finding of fraud. *Long*, 383 N.W.2d at 455. The trustee also argues that the doctrine should not apply to bankruptcy trustees as a matter of public policy because it would harm innocent creditors. A creditor who relied on a false financial statement may, under certain circumstances, have a claim against a complicit accountant. *Nycal Corp. v. KPMG Peat Marwick LLP*, 426 Mass. 491, 688 N.E.2d 1368, 1371–74 (1998). But complicity is not alleged in this malpractice action. Furthermore, courts regularly consider in pari delicto defenses and act to bar trustee claims on that basis despite the inevitable harm to creditors. *See Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 482 F.3d 997, 1001 (8th Cir.2007) (listing numerous federal bankruptcy cases applying in pari delicto doctrine). The facts in this case do not provide a basis to vary from the settled application of the doctrine.

The trustee's final argument is that the district court's refusal to rule on Grant Thornton's comparative-fault defense required the court to also defer consideration of the in pari delicto defense, because it also compares fault. The two defenses, however, are conceptually distinguishable and do not require simultaneous resolution.

The undisputed facts are as follows: Technimar and Breton entered into an agreement to complete the equipment purchase, under which Breton agreed to provide $7.6 million of the required guaranty, in September 1996. The Technimar board ratified this agreement. In December 1996 Breton and Technimar's CEO entered into another agreement obligating Technimar to replace Breton's position as guarantor, over a period of three months. This agreement was never ratified by the board and was never presented to Grant Thornton despite the CEO's assertion that Technimar had provided Grant Thornton with all relevant financial records and related data. Because Grant Thornton did not know of the December agreement, it overstated Technimar's equity and that action provided the basis for this lawsuit.

The district court held that whether that overstatement constituted negligence was for the jury to resolve, thus any relative negligence was also a jury determination. On the in pari delicto issue, however, the court could *presume* that Grant Thornton was negligent and still determine that the trustee was equitably barred from recovering for that negligence because Technimar "bears at least substantially equal responsibility for the injury it seeks to remedy." *Official Comm. of Unsecured Creditors of*

*Allegheny Health, Educ. & Research Found. v. Pricewaterhouse Coopers, LLP,* No. 2:00cv684, 2007 WL 141059, at *13 (W.D.Penn. Jan. 17, 2007). And when "a defendant's only sin is its failure to prevent transgressions by the plaintiff, no benefit flows to the public from rewarding the transgressor." *Miller v. N.Y. Produce Exch.,* 550 F.2d 762, 768 (2d Cir.1977).

The district court held that Technimar's inequitable conduct precluded it from seeking damages for the harms to which that conduct contributed. Bearing in mind that equitable decisions are discretionary, we find no basis on which to conclude that the district court abused its discretion in finding that the trustee, who now stands in Technimar's shoes, is equitably barred from asserting the malpractice and breach-of-contract claims.

## DECISION

The district court properly granted summary judgment because the trustee's claims fail to allege recognized, nonspeculative damages; fail to establish sufficient evidence of causation; and are equitably barred by the doctrine of in pari delicto.

**Affirmed.**