*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0131**

McGrann Shea Carnival Straughn & Lamb, Chartered,
Respondent,

vs.

Clinton Roberts,
Appellant.

**Filed August 11, 2014
Affirmed
Huspeni, Judge***

Hennepin County District Court
File No. 27-CV-12-6058

Michael A. Klutho, Jeffrey R. Mulder, Bassford Remele, P.A., Minneapolis, Minnesota;
and

Kathleen M. Brennan, McGrann Shea Carnival Straughn & Lamb, Minneapolis,
Minnesota (for respondent)

Richard E. Bosse, Law Offices of Richard E. Bosse, Chartered, Henning, Minnesota (for
appellant)

Considered and decided by Schellhas, Presiding Judge; Reilly, Judge; and

Huspeni, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HUSPENI**, Judge

Appellant, a former client of respondent law firm, challenges the summary judgment granted to respondent on its account-stated claim, arguing that the district court erred in dismissing appellant's legal-malpractice counterclaim and rejecting his defense that respondent's fees were unreasonable. Because we see no error in either determination, we affirm.

## FACTS

Appellant Dr. Clinton Roberts, a dentist, purchased a dental clinic in Blooming Prairie, MN, from Dr. John Flor in 1993; in 1995, they created the Main Street Dental Partnership (the partnership). In 1996, the partnership opened a second clinic in Blooming Prairie; this clinic, known as the MC, served only patients on medical assistance. By 2002, clinics had been opened in Rochester and Owatonna, and other dentists had joined the partnership. Appellant was generally in charge of the MC, which was more profitable than the other three clinics combined.

In 2003, the partnership's Buy-Sell Agreement (the agreement) was amended to provide that one partner could be expelled by the others (the expulsion clause). It provided that "[t]he re-purchase of the terminated partner's interest will be that amount of buy-in purchase price which the terminating partner had paid."

By December 2003, other partners had investigated some of Roberts's practices by, among other things, entering the names of fictitious patients into the computer system and seeing what happened to them. The partners accused Roberts of improper billing

2

practices, including violations of Department of Human Services (DHS) regulations, and of scheduling the most profitable patients to himself. Roberts was allowed to remain in the partnership, but was required to forfeit his 2003 bonus, his position as manager of the MC, and his right to modify the schedule.

In 2004, Doral Dental, a third-party provider for medical-assistance patients, audited the records of 16 of appellant's patients and discovered an overpayment of $17,298, more than $1,000 per patient. The partnership, represented by an attorney, negotiated and agreed to pay $317,719 to resolve its billing issues with DHS and $100,060.34 to resolve its billing issues with Doral Dental. The total was $417,779.34; of this, $283,493 was attributable to appellant's patients.

The partnership expelled appellant, who had initially paid $87,791.97 to join it, and the expulsion clause entitled him to recover only that amount from the partnership. But appellant wanted to recover the amount of his share of the partnership, and to this end he hired a law firm, respondent McGrann Shea Carnival Straughn & Lamb, Chartered, (McGrann Shea). In 2005, the partnership asserted counterclaims for the amounts it had paid to DHS and Doral Dental and for attorney fees and damages, and McGrann Shea demanded arbitration.

During the extensive discovery that preceeded the arbitration, the partnership requested an admission "that as of April 17, 2004, [appellant] had paid a total of $87,791.97 to Dr. Flor for [his] purchase of the Main Street Dental Practice." Appellant told McGrann Shea this information was "correct." McGrann Shea therefore answered the request with "Admit so long as the 'Main Street Dental practice' refers to the Main

3

Street Dental partnerships." During appellant's deposition, he was asked about the expulsion clause and testified: "[Flor] presented the expulsion clause to me and said to take a look at it. 'See what you think.' I looked at it, I said, 'Yeah, it looks fine.'"

The arbitrators reached six conclusions: (1) appellant's expulsion complied with the parties' agreement and was not unlawful; (2) under the expulsion clause of the agreement, appellant's recovery was limited to the $87,791.97 he said he paid for his interest in the partnership; (3) appellant was entitled to $13,612.50 in unpaid compensation and to cancellation of a note for $10,836.53 owed to Flor; (4) the partnership's settlements with Doral and DHS were reasonable and necessary; (5) appellant benefitted from improper billing in the amount of $213,000, which he had to restore to the partnership, and (6) each party was responsible for its own attorney fees.

Appellant stipulated to disciplinary action with the Board of Dentistry. In his stipulation, he admitted that he "engaged in unprofessional conduct, provided unnecessary services, and improperly billed DHS, third-party payors, and/or others relating to the practice of dentistry."

From 2006 to 2010, McGrann Shea sent appellant fee statements. Appellant made no objection to the fees and paid them in part, explaining in letters to McGrann Shea that he was unable to make full payment and that he intended to do so eventually.

In 2011, McGrann Shea brought this action against appellant for payment of fees in excess of $100,894.30, with the exact amount to be determined at trial. In his answer, appellant objected generally to the amount of the fees, but did not identify any particular fee or group of fees as unreasonable. In 2012, 17 months after being served with

4

McGrann Shea's complaint, appellant served and filed an amended answer asserting counterclaims for legal malpractice, supported by two identical expert affidavits. Appellant's affiants provided supplemental affidavits shortly before the hearing on the parties' cross motions for summary judgment.

The district court granted McGrann Shea's motion for partial summary judgment on its claim for $100,672.67 in attorney fees, and dismissed appellant's counterclaims. Appellant challenges the district court's conclusions that (1) appellant failed to show that he would have obtained better results but for McGrann Shea's conduct in regard to: (a) Flor's alleged fraudulent inducement of appellant, (b) the determination of the amount appellant received for his share in the partnership, (c) the determination of the amount appellant had paid for his share in the partnership, (d) appellant's claim for funds from new partners' promissory notes, and (e) appellant's non-involvement in the DHS settlement negotiations; and (2) McGrann Shea was entitled to partial summary judgment on its claim for fees accrued as of December 31, 2010. [1]

## DECISION

**Standard of Review**

On appeal from summary judgment, this court reviews de novo whether a genuine issue of material fact exists and whether he district court erred in its application of the

---

[1] McGrann Shea argues in the alternative that appellant's claims are barred by the fraudfeasor doctrine, which precludes him from benefitting from his fraudulent acts. Because the district court did not address this argument, it is not properly before the panel. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) ("A reviewing court must generally consider only those issues that the record shows were presented [to] and considered by the trial court in deciding the matter before it." (quotation omitted)).

law.  *STAR Centers, Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002).

## I.     Legal Malpractice Claims

A claim for legal malpractice requires: (1) an attorney-client relationship; (2) acts amounting to negligence or breach of contract on the part of the attorney; (3) that the attorney's acts be the proximate cause of the plaintiff's damages; and (4) that, but for the attorney's acts, the plaintiff would have been successful in the underlying action or transaction. *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn. 2006).  To establish the fourth element, a plaintiff must present "concrete evidence" of what actions the other party would have taken but for the attorney's negligence or malfeasance and what those actions would have reasonably produced.  *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 813 (Minn. App. 2007) ("Certainly, many positive things *could* have occurred but for [the attorney's] alleged negligence, but these speculative potential outcomes are the problem with the causation element rather than the answer to it."), *review denied* (Minn. Sept. 18, 2007).  The district court dismissed appellant's malpractice claims because he "has failed to show how, but for the alleged attorney misconduct, he would have been more successful in the underlying action or transaction, an essential element for each of his claims."

### A.     Fraudulent Inducement

When appellant was expelled from the partnership, the expulsion clause provided that "[t]he re-purchase of the terminated partner's interest will be that amount of buy-in purchase price which the terminating partner had paid."  Appellant argues that he thought

the provision would apply only to junior partners, i.e., not himself and Flor; that Flor fraudulently induced appellant to sign the agreement containing this provision, and that therefore McGrann Shea should have pursued a fraudulent-inducement claim against Flor.

Fraudulent inducement is an affirmative defense to contract formation that requires

> (1) a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage as a result of the reliance.

*Hoyt Props. Inc. v. Prod. Res. Group L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007). The district court found that a fraud-in-the-inducement claim against Flor would have failed as a matter of law because the record, in particular appellant's 2005 arbitration deposition, defeats the claim.

Appellant testified in 2005 that he and Flor "never discussed if the expulsion clause had any value or had any pert[inence] to either Dr. Flor or to myself." When asked if Flor ever told him that the expulsion clause would apply only to "new" or "junior" partners, not to themselves, appellant answered:

> Did we discuss that? I don't recall. . . . [L]ike I said, it was my understanding that it didn't pertain to Dr. Flor and myself because we were the senior partners. I mean, we must have discussed it, but I don't recall the specific conversation discussing . . . what the clause would mean or what it didn't mean or this is what it pertains to or this is not what it

7

pertains to. What I recall is that I was shown what the language looked like [by Flor].

The terms "senior partner" and "junior partner" do not appear in the expulsion clause or anywhere else in the buy-sell agreement, and no other language indicates that such a distinction was made. While that distinction may have been in appellant's understanding of the expulsion clause, nothing in the record supports it; moreover, appellant testified that, when Flor pointed the expulsion clause out to him and asked for his view, appellant approved it. Appellant did not testify, explicitly or implicitly, that Flor concealed or misrepresented the language, that Flor knew that what he was saying about the agreement was false, or that Flor intended to have appellant rely on false information.

At the beginning of his 2013 deposition in this case, appellant was questioned about his 2005 deposition for the arbitration.

> Q. Was there anything in your [arbitration] transcript that you recall that you needed to change that you didn't think was accurate?
> A. No.
> Q. You were under oath at that time, correct?
> A. Correct.
> Q. And you gave truthful testimony at that time, correct?
> **A.** Yes.
> Q. And there's nothing you think you need to change as far as your prior testimony, correct?
> A. No.
> Q. Is that correct?
> A. That's correct, yes.

Thus, appellant unambiguously and explicitly testified in 2013 that his 2005 testimony was accurate.

8

But appellant directly contradicted his 2005 testimony in an affidavit he produced in 2013. In the affidavit, he said, "Dr. Flor presented the idea to me of adding an Expulsion Provision to the contract. Dr. Flor explained to me that the Expulsion Provision would not apply to him or to myself. The Expulsion Provision, as Dr. Flor explained, would only apply to the new partners." Appellant argues on appeal that "[i]t is . . . apparent that the District Court did not consider [this] Affidavit." But he does not explain why the district court should have ignored sworn deposition testimony taken in 2005 about an event in 2003 and relied instead on an affidavit prepared in 2013. Thus, McGrann Shea did not err by not bringing a fraud-in-the-inducement claim against Flor, because appellant himself had provided testimony that would defeat such a claim.

Even if McGrann Shea had brought the claim, the result would not have been to vacate the expulsion clause. Absent a conclusion that Flor committed fraud in the inducement to get appellant to sign the buy-sell agreement, there is no basis to vacate the provision limiting an expelled partner's payout to the amount he paid to purchase his partnership. The record supports both.

The district court's finding that a fraudulent-inducement claim against Flor would have failed and its conclusion that McGrann Shea did not commit malpractice by failing to bring or pursue such a claim were not erroneous.

**B.** **The amount of appellant's payment for his share in the partnership**

Because appellant told McGrann Shea that $87,791.97 was the amount he paid to purchase his partnership, McGrann Shea admitted this amount when the partnership requested that admission. During his deposition, appellant could not explain why he gave

9

inaccurate information to McGrann Shea or how McGrann Shea should have known his information was inaccurate. The district court found that appellant "has presented no evidence that his truthful response [to the request for an admission that he had paid $87,791] was inaccurate."

Appellant now argues that McGrann Shea "fail[ed] to properly review and investigate responses to requests for admissions" and specifically that McGrann Shea should not have accepted the $87,791 figure appellant provided because it had received an accountant's statement valuing's appellant's partnership interest at $244,000. But the expulsion clause restricts the amount appellant, an expelled partner, could receive to "that amount of buy-in purchase price which [he] had paid." He was not entitled to the value of his partnership interest. Even if McGrann Shea did fail to pay sufficient attention to the accountant's valuation of that interest, the failure was irrelevant to the amount appellant could have received.

## C.  Failure to hire an accountant to determine the amount appellant paid

In the alternative, appellant argues that it was malpractice for McGrann Shea not to hire an accountant to determine what he paid to join the partnership. The district court found

> that no one [was] in a better position than [appellant] to know what he paid in, not an accountant and not a lawyer. [He] has personal knowledge of his bank records. What he paid for his interest in the Partnership does not require any accounting at all.  [McGrann Shea] can surely rely on [appellant's] admission [that the amount was $87,791] without hiring an accountant.

10

Appellant relies on an August 4, 2005, letter to McGrann Shea from an accountant saying, in "a summary of [his] preliminary findings," that "[appellant] paid approximately $244,163 for his interest in the partnerships." But, on December 15, 2005, in reply to McGrann Shea's request for "the calculation of the amount [appellant] has already paid on his buy-in for Main Street Dental," the accountant wrote first, "I do not recall that I have actually computed this amount yet," then said, "[u]pon formation of the Main Street Dental partnership, [appellant purchased a 50% interest] with a new note in the amount of $98,628.50." When appellant was expelled, he still owed Flor $10,836.53 on that note. The accountant subtracted $10,836.53 from $98,628.50 to arrive at $87,791.97, the amount appellant himself said he paid for his interest in the partnership.

Thus, McGrann Shea did inquire of an accountant how much appellant had paid for his partnership share, and the accountant's calculation confirmed appellant's statement of the amount. McGrann Shea did not commit malpractice by failing to have an accountant calculate the amount and, even if another accountant had been hired, appellant has presented no evidence that he did pay more than the $87,791.97 he himself said he paid.

**D.    Junior Partners' Notes**

Appellant argues that McGrann Shea committed malpractice by failing to pursue a claim for a share of the junior partners' ongoing payments for their partnerships. This claim, like the others, is defeated because appellant does not show that, as an expelled partner, he was entitled to anything other than a refund of the amount he paid to join the partnership.

11

In any event, McGrann Shea did pursue this claim. The amended arbitration claim it prepared alleges that the remaining partners "breached their contract with and fiduciary duty to [appellant] by not paying him for his interest in MSDC, including his portion of on-going payments from dentists buying in to the partnerships" and said "a constructive trust should be place on any partnership buy-ins for [the new partners]." Following the arbitrators' release of their decision, McGrann Shea wrote to the arbitration case manager to ask about a claim not mentioned in the award, namely appellant's claim for "the value of unpaid promissory notes and accrued interest from new partners for purchases of partnerships from [appellant] in the amount of $364,842.79 as of October 31, 2005." Both the partnership and the arbitrators responded to McGrann Shea's letter by noting that the award explicitly said that any claim "not expressly granted was denied"; since appellant's claim for a share of new partners' promissory-note payments was not expressly granted, it was denied. Thus, McGrann Shea did not commit malpractice by failing to make and pursue a claim for a share of new partners' payments.

E.     **Failure to involve appellant in the DHS and Doran Dental negotiations**

Appellant argues that McGrann Shea committed malpractice by failing to get involved and to involve him personally in the negotiations with DHS and Doral. Again, appellant offers no evidence that a better result would have been obtained had McGrann Shea done so. Appellant's own experts were equivocal as to the result of such involvement, saying only that DHS "*more likely than not* would have compromised the claim *probably* to half or $150,000.00 to $200,000.00, reducing [appellant's] maximum

12

share from $213,000.00 to $100,000.00 as the arbitrators and jury would *most likely* have found." (Emphasis added.)

The district court, relying on *Blue Water Corp. v. O'Toole*, concluded that appellant's argument was "nothing more than outright speculation that a governmental agency would have offered a better settlement deal" and that "[this] speculation . . . is wholly insufficient as a matter of law." 336 N.W.2d 279, 284 (Minn. 1983) (reversing jury verdict finding legal malpractice and granting attorney JNOV because "jury's finding of causation [of damages by attorney's negligence] rested on impermissible conjecture").

Appellant argues that the district court erred in concluding that appellant's experts' evidence was speculative because they used terms such as "most likely" and "probably," because the evidentiary standard is that the claim "is more likely true than not." CIVJIG 14.15. But this argument ignores the fact that appellant's evidence was not the only evidence before the district court: McGrann Shea's expert provided an affidavit noting that appellant's own expert in the arbitration matter said appellant's billing practices were "overly aggressive," and appellant himself stipulated to the Board of Dentistry that he "engaged in unprofessional conduct, provided unnecessary services, and improperly billed [DHS], third-party payors, and/or others." The district court considered all the evidence and concluded that McGrann Shea's decision not to do its own investigation of appellant's culpability was not misconduct: such an investigation could not have produced a better result for appellant and would only have added to the cost.

The district court did not err in concluding that none of appellant's claims of legal malpractice met the fourth criterion of a malpractice claim by showing that, but for McGrann Shea's conduct, appellant would have prevailed or had a better result in his dispute with the partnership following his expulsion.

## 2.     Account Stated

The district court found that, because appellant "failed to object in writing in a timely manner" to the amounts of the fees stated by McGrann Shea for the years 2006-2010 and made partial payments of the fees for three and a half years, he could not in 2012 begin to argue that the fees were unreasonable. By that time, McGrann Shea had established an account stated that could be set aside only on the ground of fraud or mistake. *See Erickson v. Gen. United Life Ins. Co.,* 256 N.W.2d 255, 259 (Minn. 1977).

Appellant raised no genuine issue of material fact as to whether there had been fraud or mistake in the amount of McGrann Shea's fees. In an answer to a request for admissions in December 2012, appellant said "I did not object [to the fees] or dispute [them] in that I was unaware that such fees were unreasonable until I was informed by subsequent attorneys."   One of appellant's experts asserted that "[A] reasonable fee . . . would have been $150,000 to $200,000" but did not explain why that amount would have been "reasonable" or challenge any specific items in McGrann Shea's fees. The district court did not err in rejecting  appellant's expert's unsupported statement that McGrann Shea's fees were "unreasonable"  or in concluding that, under the account-stated doctrine, appellant cannot challenge fees to which he agreed for several years before declining to pay them.

14

The district court did not err in concluding either that appellant had failed to meet one element of a legal-malpractice claim by not showing that, but for McGrann Shea's acts, appellant would have achieved a better result or that appellant owed McGrann Shea the legal fees incurred as of December 31, 2010.

**Affirmed.**