**STAR CENTERS, INC., Petitioner, Appellant,**

v.

**FAEGRE & BENSON, L.L.P., Respondent.**

No. C0–00–2075.

Supreme Court of Minnesota.

May 16, 2002.

Collins, Buckley, Sauntry & Haugh, P.L.L.P., Patrick T. Tierney, St. Paul, for appellant.

Bassford, Lockhart, Truesdell & Briggs, P.A., Lewis A. Remele, Jr., Charles E. Lundberg, Robin Ann Williams, Minneapolis, for respondent.

## OPINION

LANCASTER, Justice.

Appellant STAR Centers, Inc. (STAR), sued respondent Faegre & Benson, L.L.P. (Faegre), claiming that Faegre committed legal malpractice and breached its fiduciary duty by failing to disclose information about Consortium International, Inc. (Consortium), a business from which STAR sought financing. The district court granted Faegre's motion for summary judgment and the court of appeals affirmed. Because the undisclosed information was not material to Faegre's representation of STAR, we affirm.

In 1990, Paul Selle retained Faegre to assist with the organization of STAR. Selle formed STAR to develop an indoor soccer facility. Having found a location for the facility, Selle sought financing for STAR, but had not secured financing as of January 1995.

In January 1995, Consortium retained Faegre. Consortium described itself as a "privately held professional services organization" that performed a variety of financial services for its clients. In 1995, Faegre worked on two matters for Consortium. First, in March 1995, Faegre concluded a review of securities law issues. Second, in early July 1995, Faegre drafted a letter to one of Consortium's clients expressing Consortium's concerns with respect to a press release issued by the client that stated that an agreement regarding a loan had effectively been reached. According to Consortium, the press release did not accurately reflect the state of negotiations. Although Faegre was not working on any matters for Consortium at the end of July 1995, Faegre still considered Consortium a client because its engagement was not limited to specific matters.

*Initial Consortium–STAR Financing Agreement*

In early 1995, Selle learned about Consortium through a loan officer at Mortgages Unlimited. On July 25, 1995, STAR and Consortium negotiated the preliminary terms of a financing agreement. After the meeting, Selle and John Karr, a consultant to and investor in STAR, sought additional information about Consortium.

Selle and Karr learned from Consortium that Consortium had retained Faegre. They decided to question Faegre about Consortium. Selle stated he phoned Andrew Humphrey, a Faegre attorney, to determine whether Humphrey knew anything about Consortium. According to Selle, Humphrey responded that he did not know anything about Consortium, agreed to find out what he could about Consortium, and ultimately responded that "[Faegre] had some smaller dealings with [Consortium], but nothing came up, whether it be bad or good." Karr did not remember whether it was he or Selle who asked Faegre about Consortium, nor did he remember the precise language of Faegre's response. Karr stated, however, that Faegre's response left him and Selle with the impression that "Consortium was, indeed, a legitimate business." Humphrey recalled Selle's inquiry about Consortium. According to Humphrey, he responded by stating that he did not know anything about Consortium and that it would be inappropriate for him to say anything about Consortium if Consortium was Faegre's client. Selle denied that Humphrey made such a statement to him.

In an August 7, 1995, letter to STAR, Gary Gandrud, a Faegre attorney, expressed the terms under which the firm's representation of STAR in connection with its new financing project could continue.

Shortly thereafter, Faegre obtained Consortium's and STAR's consent to Faegre's representation of STAR in connection with its financing project.

On August 9, 1995, STAR and Consortium executed a preliminary commitment agreement. A closing scheduled for October 1995 did not take place because Consortium was unable to prepare some documents. Faegre did little or no work on the deal after the closing did not take place. STAR and Consortium rescheduled the closing for December 1995 or January 1996. That closing also did not take place, however, because a shutdown of the federal government prevented STAR from obtaining part of its financing package, a loan from the Small Business Administration.

### Cemara Health Inquiry

In January 1996, William Nay contacted Sally Johnson, a Faegre attorney. Nay represented Joseph Kenney, the president and chief executive officer of Cemara Health, Inc. (Cemara). Nay asked Johnson whether Faegre would serve as an escrow agent in an effort to settle a dispute between Consortium and Cemara regarding Consortium's failure to fund a loan. Subject to resolution of possible conflicts, Johnson agreed. Nay had only two or three brief telephone conversations with Johnson on January 10 and 11, 1996. Consortium and Cemara did not reach a settlement agreement. There is no evidence in the record that Faegre was retained to serve as an escrow agent.

Later that month, Kenney wrote two letters [1] describing an advance fee scheme operated by Consortium. There is no evidence in the record that Faegre attorneys saw or heard about Kenney's letters before their depositions in this case.

1. Kenney sent one letter to the Minnesota Lawyers Professional Responsibility Board.

### Denver Golf Litigation

In early February 1996, Consortium contacted James Nicholson, its billing partner at Faegre, and asked whether Faegre would defend it in a lawsuit filed by Denver Golf, Ltd. (Denver Golf), in the United States District Court for the District of Colorado. Nicholson passed the matter to his partners in Faegre's Denver office.

Denver Golf's complaint alleged that Consortium breached a construction loan agreement. The complaint did not allege fraud, nor did it allege that Consortium's refusal was part of a larger pattern of refusals to fund loans. Faegre's conflict check revealed no conflicts. The firm made its first appearance in federal district court on Consortium's behalf on February 12, 1996. In early March 1996, Consortium filed a motion to dismiss or, in the alternative, for summary judgment, arguing that execution of the construction loan agreement was merely a "paper closing" that was done in escrow and was subject to the approval of Consortium's Board of Directors. Because the Board did not approve the loan, Consortium argued the loan agreement never took effect. On June 18, 1996, a United States Magistrate Judge recommended that Consortium's motion be denied.

Although Denver Golf's complaint did not allege fraud, Denver Golf's attorney, Paul Grant, told Faegre attorneys he thought Consortium engaged in fraud. In an affidavit submitted to the trial court in the instant case, Grant described the statements he made while working on the Denver Golf litigation:

> Shortly after the time Faegre * * * first appeared in the case and later in written discovery requests, I asked the Faegre * * * attorneys to provide docu-

The record does not reveal to whom Kenney sent the other letter.

mentation demonstrating that Consortium had funded the projects identified in their promotional literature. I told [a Faegre attorney] that I thought Consortium may have engaged in fraud. I discussed with Faegre * * * attorneys, at a hearing before a United States Magistrate, that I did expect Faegre * * * to produce documents to show that Consortium had actually made the loans described in their literature. Faegre * * * attorneys replied that they were not sure they could comply, since all Consortium loans were covered by confidentiality agreements.

Cathy Lemon, a Faegre attorney who worked on the Denver Golf litigation, stated that Grant requested documentation of Consortium's other deals because he thought that Consortium "didn't have enough money to fund all of the deals [it] had in the pipeline."

### Renewed Consortium–STAR Financing Agreement

On January 24, 1996, Consortium sent to STAR a revised formal commitment agreement. STAR asked Faegre to represent it in connection with its new financing project. On February 26, 1996, the firm sent a letter to STAR to confirm the terms of its representation. STAR and Consortium scheduled the closing for June 28, 1996, and STAR met all conditions to close on that date. On June 19, 1996, Consortium sent a letter to STAR that terminated the loan agreement. Faegre declined STAR's request to represent STAR in an action against Consortium and referred STAR to another law firm.

In August 1996, the Federal Bureau of Investigation (FBI) filed a criminal complaint against Arthur Schuyler Ross, also known as John Ross, who was Consortium's chief executive officer. The complaint alleged that Ross "and others doing business as Consortium * * * have committed and are continuing to commit [wire fraud] by operating an advance fee scheme." The FBI arrested Ross later that month.

In April 1999, STAR filed a complaint against Faegre that alleged that Faegre breached its fiduciary duty and committed legal malpractice by failing to disclose information about Consortium that was material to the law firm's representation of STAR. The district court granted Faegre's motion for summary judgment, holding that the Denver Golf litigation did not constitute a material matter about which Faegre had to advise STAR, that Faegre did not breach any duty to or contract with STAR, and that STAR could not prove that Faegre's conduct constituted the "but for" cause of STAR's damages.

STAR appealed and the court of appeals affirmed. The court of appeals declined to consider Cemara's inquiry because it did not proceed beyond an initial inquiry and did not involve a further exchange of information. The court of appeals held that the Denver Golf litigation did not constitute a material matter bearing on Faegre's representation of STAR and that the litigation did not create an impermissible conflict of interest for Faegre. Finally, the court of appeals briefly addressed STAR's causation argument, concluding that the record contained no evidence establishing that Faegre's failure to disclose the litigation to STAR was a substantial factor in causing STAR's losses.

On appeal from summary judgment, we review whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *Patterson v. Wu Family Corp.*, 608 N.W.2d 863, 866 (Minn.2000); *Offerdahl v. Univ. of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). We view the evidence in the light most favorable to

the party against whom summary judgment was granted. *Louis v. Louis*, 636 N.W.2d 314, 318 (Minn.2001); *Offerdahl*, 426 N.W.2d at 427. We review de novo whether a genuine issue of material fact exists. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 609 N.W.2d 868, 874 (Minn.2000). We also review de novo whether the district court erred in its application of the law. *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn.1997).

■ An attorney-client relationship gives rise to fiduciary duties: "The attorney is under a duty to represent the client with undivided loyalty, to preserve the client's confidences, and to disclose any material matters bearing upon the representation of these obligations." *Rice v. Perl*, 320 N.W.2d 407, 410 (Minn.1982) (emphasis omitted) (quoting Ronald E. Mallen & Victor B. Levit, *Legal Malpractice* § 121 (2d ed.1981)). "It is the undoubted duty of an attorney to communicate to his client whatever information he obtains that may affect the interests of his client in respect to the matters entrusted to him." *Selover v. Hedwall*, 149 Minn. 302, 306, 184 N.W. 180, 181 (1921).

The parties do not dispute that Faegre and STAR had an attorney-client relationship. Thus, Faegre owed fiduciary duties to STAR. The parties also do not dispute that Faegre failed to disclose the information learned about Consortium from Cemara's inquiry and the Denver Golf litigation. We turn then to whether the undisclosed information was material to Faegre's representation of STAR.[2]

■ Materiality is ordinarily a question of fact. *See State v. Stith*, 292 N.W.2d 269, 276 (Minn.1980) (stating that whether misrepresentations are material in securities fraud prosecution is a question of fact); *Strouth v. Wilkison*, 302 Minn. 297, 299, 224 N.W.2d 511, 513 (1974) (stating that whether defendant misrepresented a material fact is a question of fact). Materiality becomes a question of law, however, when reasonable minds can reach only one conclusion. *See Lubbers v. Anderson*, 539 N.W.2d 398, 402 (Minn.1995) (stating that proximate cause is generally a question of fact that becomes a question of law where reasonable minds can arrive at only one conclusion).

■ We first address whether Faegre learned information about Consortium from Cemara's inquiry that was material to Faegre's representation of STAR. An applicant's assertion that a lender refused to fund a loan, without more, reveals nothing material about the lender. To a prospective borrower, the *reasons* for the lender's refusal are what matters. During two or three brief telephone calls, a Faegre attorney learned of Cemara's allegation that Consortium refused to fund a loan. There is no evidence in the record that Faegre learned why Consortium refused to fund the loan. There is no evidence in the record that Faegre knew about Kenney's letters that described Consortium's advance fee scheme. Finally, there is no evidence in the record that Faegre knew about Consortium's lending practices. Cemara's assertion that Consortium refused to fund a loan did not reveal anything to Faegre about Consortium's ability or willingness to serve as a lender. Therefore, reasonable minds can reach only one conclusion: that the information Faegre obtained about Consortium

**2.** STAR does not seek to hold Faegre accountable for responding to its inquiry about Consortium. Instead, STAR claims that Faegre knew that STAR wanted information about Consortium's viability as a lender. STAR argues that Faegre's knowledge about Consortium's alleged refusal to fund loans therefore constituted a "material matter" to STAR.

from Cemara's inquiry did not constitute a material matter bearing on its representation of STAR.

■ Next, we address whether Faegre learned information about Consortium from the Denver Golf litigation that was material to Faegre's representation of STAR. Like Cemara's inquiry, Denver Golf's complaint does not reveal why Consortium refused to fund the loan. The complaint alleged a breach of contract. It alleged neither fraud nor that the breach was part of a larger pattern of refusals to fund loans. We hold as a matter of law, therefore, that the complaint revealed nothing about Consortium that was material to Faegre's representation of STAR.

We turn to the oral allegations of fraud. Shortly after Faegre made its first appearance on behalf of Consortium in the case, Denver Golf's attorney told Faegre that he "thought Consortium may have engaged in fraud." He also told Faegre that he did not believe that Consortium had sufficient capital to fund all of its commitments. He sought information that might substantiate his belief that there was a misrepresentation in Consortium's brochure, and did not assert that he had such proof.

To determine whether the oral allegations of fraud constituted information that was material to Faegre's representation of STAR, we must analyze them within their context. First, Denver Golf and Consortium were litigating a claim that Consortium breached a contract by refusing to fund a loan. Denver Golf's complaint did not allege fraud. Second, there is no evidence in the record that Denver Golf offered evidence to support its allegations of fraud.[3] The attorney mentioned fraud in the context of a request for information to support his belief that Consortium engaged in fraud. Third, in March 1996, Consortium filed a motion to dismiss or, in the alternative, for summary judgment. Not until June 18, 1996, the day before Consortium terminated its loan agreement with STAR, did the magistrate recommend that Consortium's motion be denied. There is no evidence in the record that Faegre had reason to doubt Consortium's explanation that its execution of the loan agreement was merely a "paper closing" that was done in escrow and was subject to the approval of Consortium's Board. Without some evidence to support the oral allegations, Faegre had no reason to think that they were anything but litigation tactics, and reasonable minds can conclude only that the unsubstantiated allegations of fraud were not material to Faegre's representation of STAR. Therefore, we hold as a matter of law that Faegre did not learn information that was material to its representation of STAR from the oral allegations of fraud.

■ "Unquestioned fidelity to their real interests is the duty of every attorney to his clients." *In re Lee's Estate*, 214 Minn. 448, 460, 9 N.W.2d 245, 251 (1943). Attorneys must be vigilant to ensure that representation of one client does not jeopardize that of another. On these facts, we hold as a matter of law that Faegre did not obtain information from Cemara's inquiry or the Denver Golf litigation that was material to its representation of STAR. Consequently, we need not consider the parties' remaining arguments that assume the undisclosed information was material to Faegre's representation of STAR.

**Affirmed.**

---

**3.** We do not suggest that an attorney in the position of the Faegre attorneys herein should ignore even bare allegations of fraud. Rather, the attorney must be alert to allegations that have teeth to them in the form of evidence, such as a misrepresentation, indicating a colorable claim.

ANDERSON, Paul H., and ANDERSON, Russell A., JJ., took no part in the consideration or decision of this case.