*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0548**

John Stratton,
Appellant,

vs.

Pop Dental, LLC, et al.,
Defendants,
Karl Dexheimer, et al.,
Respondents.

**Filed December 7, 2015
Reversed and remanded
Stauber, Judge**

Hennepin County District Court
File No. 27-CV-14-1177

John Stratton, Minnetonka, Minnesota (pro se appellant)

Jonathan Drewes, Drewes Law, PLLC, Minneapolis, Minnesota (for defendants)

David G. Hellmuth, Carol R.M. Moss, Terrance W. Moore, Hellmuth & Johnson, PLLC, Edina, Minnesota (for respondents)

Considered and decided by Smith, Presiding Judge; Stauber, Judge; and Klaphake, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**STAUBER**, Judge

Appellant, a former business colleague of respondents, challenges a summary judgment on his claims of tortious interference with contract and tortious interference with economic advantage arising out of the parties' collaboration in development of a new business. We reverse and remand because the district court erred by granting summary judgment when material fact issues exist on these claims.

## FACTS

Pro se appellant John Stratton participated in the development of a designer toothbrush business known as Pop Dental, LLC (Pop Dental). In March 2012, long-time acquaintances Stratton and defendant Jeffrey Miller met to discuss Miller's concept to manufacture a designer electric toothbrush. Stratton had extensive experience in the capital markets industry, and Miller asked him to "partner up" to "leverage [Stratton's] extensive network of potential investors and various industry experts." A limited liability company, Pop Dental, was created in August 2012. Initially, Miller and Stratton had no written contract, but they agreed that Stratton "would receive compensation through payments of cash in the future, transfer of equity and [a] board seat" in Pop Dental.

Because neither Stratton nor Miller had sufficient capital to bring the product to market, Stratton sought outside investors, and for the next year he "spent approximately 1,000 hours researching the opportunity, developing and drafting the business plan, investor PowerPoint presentation, financial model and introducing . . . Pop Dental to potential investors." Stratton met with over 100 potential investors from fall 2012 to July

2013, including respondents Karl Dexheimer, Chris Fraley, and Dr. Scott Bowlby. Dexheimer is the owner of Buyers Support Group, Inc. (Buyers Support Group), a "[m]anufacturer's [r]ep [f]irm" that vets prospective product suppliers for Target stores; Target is Buyers Support Group's primary client. Bowlby and Fraley, friends of Stratton's, were potential investors; Fraley had given Stratton $15,000 to invest in the company.

From Pop Dental's inception, Target became the primary focus as a first sales source. Through both Dexheimer and a contact of Stratton's, John Willoughby (Target's director of business partnerships and negotiations), Pop Dental engaged in sales negotiations with Target. According to Dexheimer, Target never issued a purchase order (PO) for Pop Dental products. Target defines a PO as "any order by Purchaser for the purchase of specified quantities of Goods at specified prices from Vendor." According to Stratton, Target issued a PO for Pop Dental products on June 18, 2013. Stratton claims the PO is memorialized in an email from Dexheimer to Miller and Stratton, which states:

> Boys, we have a **commitment** from Target as follows:
> - 1 assorted sku on the 12/1-28 endcap in 218 stores
> - # of patterns/colors is probably 5 but I'm awaiting Linda's[1] confirmation
> - Looking at setting with 8 units per store
> - We will probably have one replenishment PO to ship at the same time as the set
> - We are responsible for 100% of all clearance markdowns post endcap (this is standard)

---

[1] Dexheimer and Stratton engaged in many discussions with Linda Sullivan, the head buyer of Target's oral healthcare and beauty products.

Dexheimer sent another email to Miller and Stratton on June 20, 2013, saying that he "just spoke to Linda," and had a "couple of updates":

- Total buy for our 218 store test will be 16 units per store x 218 stores = 3,488 total units
- At a $23.00 cost this amount[s] to $80,224
- Very small yes but it is a start!
- She wants a case pack of 8 so in each master we could have 4 inners of 2.
- She will provide the store grouping when available
- She did confirm it will be in the super affluent stores which is awesome
- We agreed on a rate of sale of 4 units per store per week

On June 26, 2013, Stratton, Miller, and Pop Dental entered into an agreement that provided for Stratton to be appointed to the Pop Dental board and to be awarded gradual increases in Pop Dental equity "once certain milestones have been reached." Stratton would receive ten percent equity in the company "once Target Corporation transmit[ed] a PO" and would receive 15% equity in the company once he "raise[ed] $75K-$150K in equity/debt from investors," and could ultimately own up to 35% equity in the company. The agreement also included a schedule of fees Stratton was to be paid for "fundraising," allotting him a ten percent fee when the company received "$0-$1M" in funds, an eight percent fee when the company received "$1M-$2M" in funds, etc.[2]

---

[2] In the memorandum of law attached to its order for summary judgment, the district court notes that appellant was forced to return the $15,000 to Fraley that Fraley intended as an investment in Pop Dental. This statement contradicts the district court's later statement that "It is undisputed . . . that Pop Dental did not receive funds from . . . investors."

4

During the summer of 2013, Stratton and Miller's relationship began to sour, largely due to friction over whether Miller should accept changes in Pop Dental that were proposed by potential investors, who required their demands to be met before they would agree to fund the company, operational deficiencies within the company, and Stratton's failure to obtain financing. According to Stratton, Miller was very reluctant to meet potential investor demands and caused operational deficiencies within the company. In an email sent to Stratton on June 24, 2013, Miller stated that he "need[ed] passive investors for [the] first round because the money needs to go in the bank by tomorrow or Wednesday [at the] latest" and listed $335,000 in manufacturing, packaging, and design costs. During a July 20, 2013 phone call with Miller, Stratton said "we've got to get corporate documents done . . . because we've got some investors that are concerned." When Miller purportedly responded "I am not going to jump through hoops for these investors," Stratton purportedly "lost it" and swore at Miller, who "giggled." On July 22, 2013, Stratton sent an email to Miller that pressed him to agree to operational changes in the company, including making Stratton interim president. In response, Miller sent Stratton an email that said, in part,

> As we have discussed many times, today I control 100% of Pop [D]ental, there is no board of directors, Pop [D]ental is an LLC owned by me and me alone. It is cut and dried and there should be no debate whatsoever. Your reward for all your effort will come when you raise money and the terms are acceptable to Pop [D]ental. We have a simple and unique arrangement that provides you a potential windfall when you get results. You are rewarded if and when John Stratton raises money and it's acceptable to Pop [D]ental.

5

**If you don't raise money and the Target deal falls thru, there is nothing guaranteed to you. You have to confirm that this is understood or explain to me what I'm missing so I can understand your view.

This is the starting point for me and any other emails or conversations will be a waste of time for both of us. It's very simple and clear. I'm done with debates and will not have another situation like the one on Saturday. That outburst was shocking and very troubling to [my wife] and me and I will require that it never happens again.

On behalf of the company, Miller terminated the relationship between Pop Dental and Stratton on July 25, 2013. Miller had also removed Stratton as a board member on July 24, stating that he "was inadvertently appointed to the Board."

On July 28, 2013, Dexheimer met with Stratton at the Interlachen Country Club. Stratton believed that the purpose of the meeting was to "meet with . . . Miller and save the company," but after a few minutes Fraley and Bowlby joined the meeting. It became clear to Stratton that the purpose of the meeting was to force him out of the company; the others directed him to just "sign off" his interest in the company, with no compensation," and told him that, if the company was later successful, Miller would "throw [him] a bone." On behalf of Buyers Support Group, Dexheimer separately told Stratton to terminate his involvement with Pop Dental by August 2 or jeopardize the agreement between Target and Pop Dental.

According to Stratton, actions that occurred after the Interlachen meeting demonstrated to him that Dexheimer and the other respondents had usurped his role in the company. A few days after the meeting, when Stratton asked how Dexheimer could speak on behalf of Pop Dental, Dexheimer answered, "Miller doesn't understand finance

6

and . . . is on a short leash now." Dexheimer also contacted Matt Stratton, Stratton's twin brother, to attempt to have Matt Stratton encourage his brother to sign a release of any interest in the company. Dexheimer's email to Matt Stratton states:

> I want to reiterate a key point and that is if Target goes away, John will get nothing because Pop Dental will cease to exist. The only thing John will get from not doing the right thing is an indelible black mark by his name for the rest of his life. Additionally, John needs to realize what is at stake should he not do the right thing. As we discussed, there is more at risk for him than just his personal reputation.

According to Matt Stratton, Dexheimer had called him earlier to say that if Stratton did not accept the offer to "part ways," then "the gloves are off and someone in the group, not me, will call John's wife and give up all his dirt." Dexheimer refused to answer when Matt Stratton asked him "how could it be possible to go from playing golf with John a week earlier at Interlachen to this." During discovery, Stratton obtained cellphone records from respondents and Miller that showed many calls between them during this period.

Stratton sued Pop Dental, Miller, Dexheimer, Fraley, Bowlby, and Buyers Support Group, alleging six counts. As to Miller and Pop Dental, Stratton alleged (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing; as to all defendants, Stratton alleged (3) tortious interference with contract; (4) tortious interference with prospective advantage; (5) coercion; and (6) a piercing the corporate veil. Respondents moved to dismiss or for summary judgment, and the district court granted the motion in part, dismissing the coercion claim and both tortious-interference

7

claims as to Pop Dental and Miller. Stratton then settled the remaining claims he had against Pop Dental and Miller.

The district court held a hearing on the other four respondents' motions for summary judgment on September 3, 2014. Following the hearing, the district court granted summary judgment in favor of respondents. As to the tortious-interference-with-contract claim, the district court ruled that Stratton could not show that any respondent "intentionally procured a breach of the June 26 Agreement." The court stated that any tortious conduct on the part of respondents occurred after Miller had terminated the contract with Stratton; that the cellphone records did not show "collusive conduct" on the part of respondents; that a reference by a Pop Dental shipper in October 2013 to the fact that he could not be paid by Pop Dental because, according to Miller, his "partners" were "bleeding him dry and making him pay" litigation costs, was inadmissible hearsay; and Stratton had failed to establish damages. The district court also granted summary judgment on the tortious-interference-with-prospective-advantage claim on the same grounds, stating that Stratton did not show that "Pop Dental could have actually produced the product to satisfy the Target order."

**D E C I S I O N**

Summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from summary judgment, this court reviews de novo "whether there are any genuine issues of material

8

fact and whether the district court erred in its application of the law." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76 (Minn. 2002). This court "view[s] the evidence in the light most favorable to the party against whom summary judgment was granted." *Id.* at 76-77.

## I.     Tortious-Interference-with-Contract Claim

"A cause of action for tortious interference with contract has five elements: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015) (quotation omitted). It is undisputed that Stratton had a contract with Pop Dental and that respondents were aware of or should have been aware of the contract. *See Kjesbo v. Ricks*, 517 N.W.2d 585, 588 n.3 (Minn. 1994) ("It is enough if the defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to complete disclosure of the contractual relations and rights of the parties.").

The district court determined Stratton's failure to establish the third and fifth elements of the cause of action dispositive. As to the intentional procurement of the breach, the district court ruled that Stratton "admitted during his deposition that he had no knowledge of any action by [respondents] which caused or induced Miller to terminate the June 26 Agreement." The district court also reasoned that there was no factual dispute regarding the July 23, 2013 termination date of the contract, because on that date Miller sent an email to Stratton emphatically ending the relationship between Stratton and

9

Pop Dental, and because Stratton admitted that he believed his services for Pop Dental had been terminated as of that date.

Stratton argues that he was unaware of many facts that later became known during discovery. He also argues that the July 23 email and the attempt to remove him from the board were ineffective. The district court did not view the facts in Stratton's favor as the nonmoving party. Viewing the facts in Stratton's favor: (1) Pop Dental had the equivalent of a PO from Target to produce its product, including a specified quantity of product at a specified price; (2) Miller and Stratton had a stormy relationship but were very close to reaching their mutual goal of developing and funding[3] the initial product offering; and (3) respondents interfered with the contract between Miller and Stratton in order to oust Stratton from the business. Dexheimer's apparent efforts to remove Stratton from the company, the statements of other respondents discouraging individuals from investing in Pop Dental or dealing with Stratton, and the close timing of Stratton's ouster and the Interlachen meeting, provide sufficient facts to withstand a motion for summary judgment on whether respondents intentionally interfered with the contract between Stratton and Miller.

Further, the timing of the termination of Stratton's agreement with the company is not firmly established. Although Miller sent Stratton an email attempting to terminate his relationship with Pop Dental on July 23, Stratton had allegedly partially performed the contract at that point, he continued to act on behalf of Pop Dental after receiving the

---

[3] Stratton produced affidavits from numerous individuals stating that they would have provided initial equity capital for Pop Dental; the sum of the amounts listed in these affidavits appears to be close to the amount needed to fund the company initially.

email, and respondents continued to treat Stratton as if the contract was viable by negotiating the terms of his leaving the company after that date. The questions surrounding Stratton's departure from the company also raise material questions for the factfinder.

The district court also reasoned that Stratton could not establish a prima facie case of damages. Damages are not recoverable if they are "speculative, remote, or conjectural." *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977) (quotation omitted). "The usual remedy provided by Minnesota law for interference with contract is to compensate the victim for the damages that resulted from the loss of the contract." *Storage Tech. Corp. v. Cisco Sys., Inc.*, 395 F.3d 921, 925 (8th Cir. 2005). "Although the law recognizes that it is more difficult to prove loss of prospective profits to a new business than to an established one, the law does not hold that it may not be done." *Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 267 (Minn. 1980) (quotation omitted). A benchmark for damages could be the value of Stratton's services in fundraising or the value of Stratton's portion of the $80,000 Target deal for the initial Pop Dental offering. Stratton has shown a basis for damages that is not speculative or conjectural.

In sum, we conclude that there are material disputes of fact over whether respondents tortiously interfered with Stratton's Pop Dental contract.

II. **Tortious-Interference-with-Economic-Advantage Claim**

A cause of action for tortious interference with economic advantage consists of five elements:

11

1) The existence of a reasonable expectation of economic advantage;

2) Defendant's knowledge of that expectation of economic advantage;

3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;

4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and

5) That plaintiff sustained damages.

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). "[A] plaintiff must specifically identify a third party with whom the plaintiff had a reasonable probability of a future economic relationship. Thus, a plaintiff's projection of future business with unidentified customers . . . is insufficient as a matter of law." *Id*. at 221-22.

As the parties and the district court's summary-judgment decision note, this cause of action is less difficult to prove than a tortious-interference-with-contract claim because it depends only on proof of an economic advantage and not the existence of a contract. *See Witte Transp. Co. v. Murphy Motor Freight Lines, Inc.*, 291 Minn. 461, 465, 193 N.W.2d 148, 151 (1971) (recognizing that a tort claim can be brought "for the wrongful interference with noncontractual as well as contractual business relationships"). Further, the cause of action depends on the *reasonable* expectation of economic advantage and the *reasonable* probability that Stratton would have achieved an economic benefit but for the actions of respondents. Stratton established the parameters of Pop Dental's business relationship with Target and their close proximity to reaching an agreement regarding the

12

sale of Pop Dental's product, potential investors' willingness to fund Pop Dental, and respondents' actions to eliminate Stratton's ability to profit from his role in the company. Therefore, the question of whether Stratton demonstrated the existence of a reasonable expectation of economic advantage should be decided by the factfinder after hearing testimony from the key parties involved in developing, funding, and investing in Pop Dental. *See Gieseke*, 844 N.W.2d at 221 (describing reasonable expectation of future economic relationship as "the expectation that the relationship eventually will yield the desired benefit, rather than the more speculative expectation that a potentially beneficial relationship will arise" (quotation omitted)); *see also DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997) (stating that "summary judgment is inappropriate when reasonable persons might draw different conclusions from the evidence presented").

**Reversed and remanded.**