*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1358**

Michael Barlow,
Appellant,

vs.

Hospitality Center for Chinese, Inc.,
Respondent.

**Filed May 31, 2016
Affirmed
Hooten, Judge**

Hennepin County District Court
File No. 27-CV-14-434

Todd M. Johnson, Scott A. Johnson, Wilbert V. Farrell, Hellmuth & Johnson, PLLC, Edina, Minnesota (for appellant)

David J. Hoekstra, David M. Werwie & Associates, St. Paul, Minnesota (for respondent)

Considered and decided by Hooten, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

# U N P U B L I S H E D   O P I N I O N

**HOOTEN**, Judge

Appellant challenges the district court's grant of summary judgment in favor of respondent, arguing that the district court erred in its application of the law and by making improper factual determinations. We affirm.

**FACTS**

Respondent Hospitality Center for Chinese, Inc. (HCC) is a nonprofit organization that provides hospitality to college students and their families from China, Taiwan, and Hong Kong. As part of its outreach activities, HCC sponsors an annual summer picnic at the University of Minnesota. Appellant Michael Barlow, a volunteer for HCC, assisted with the picnic each summer from 1999 to 2012. Barlow's volunteer duties included organizing and preparing food to be served at the picnic and bringing a corn roaster to the picnic grounds to roast corn during the picnic. Each year, Barlow would pick up the corn roaster with his truck and haul it to the picnic grounds. At the picnic, Barlow would train volunteers to operate the corn roaster under his supervision, and he would also operate the corn roaster himself.

The corn roaster was an electrically powered device that rotated ears of corn through a heating element at 500 degrees until they were fully roasted. Those operating the corn roaster would be within inches of the extreme heat. Because of the constant heat emanating from the corn roaster, volunteers had to operate it in pairs, and generally no person was supposed to operate the corn roaster for more than two hours at a time. From 1999 to 2011, Barlow always placed the corn roaster under the shade of trees to reduce the corn roaster operators' exposure to heat. Prior to the 2012 picnic, Barlow never had any physical health issues related to his volunteer work at the picnics, having never fallen, fainted, or suffered a heat stroke.

Barlow volunteered to be a "team captain" in charge of food preparation for the 2012 picnic. He understood that his role would be to implement safety rules regarding the

2

operation of the corn roaster and to train other volunteers to operate the corn roaster at the picnic, having no expectation that he would actually operate the corn roaster, except to assist others as needed. It was anticipated that more than 1,600 ears of corn would be served at the 2012 picnic. HCC assured Barlow that he would have an ample amount of volunteers to train in the operation of the corn roaster. When Barlow volunteered to be a team captain, he did not agree to operate the corn roaster for the entire time needed to roast 1,600 ears of corn. Rather, he expected that the volunteers assured by HCC would operate the corn roaster under his supervision. Barlow, who was an obese 67-year-old man with diabetes at the time of the 2012 picnic, never informed anybody at HCC of any health issues that might impact his ability to perform his volunteer duties at the picnic.

On the day of the 2012 picnic, Barlow arrived at the picnic grounds with the corn roaster. Upon arrival, he was informed that he would not be able to set up the corn roaster in the shade underneath the tree in the location where he had always set it up in previous years. The university required the corn roaster to be placed in a different location near a permanent grounding rod that the university had installed that year. Barlow opposed moving the corn roaster, complaining that there was no shade in the new location, but the corn roaster was moved to the new location over his objection.

Barlow arrived two hours before the corn needed to be served, but no volunteers came to be trained. When the time came for the corn to be roasted, Barlow plugged in the corn roaster to prepare it for roasting. Barlow waited for other volunteers as long as he could, but at approximately 2:00 p.m., he began to roast the corn by himself to ensure that the roasted corn would be available to picnic patrons. As he roasted the corn, he continued

3

hoping and expecting that volunteers would arrive so that he could train them to operate the corn roaster, but no volunteers ever appeared. Barlow did not leave the vicinity of the corn roaster once he began roasting the corn because the extremely high temperature of the corn roaster coupled with the proximity of the picnic patrons made for a dangerous situation. Operating the corn roaster required Barlow to take off and replace an ear of corn every four to six seconds. He did not turn the corn roaster off to take a break because turning the corn roaster off would render it unusable for the remainder of the picnic. Barlow claimed that because he had to attend the corn roaster continuously and because of the rapid pace at which he had to operate the corn roaster, he was unable to contact anybody in a supervisory role about his need for assistance, even though he carried a cell phone and had one of the supervisor's telephone numbers.

From 2:00 p.m. until approximately 5:00 p.m., Barlow operated the corn roaster by himself. Barlow had brought his own cooler containing bottles of Gatorade and water so that any volunteers who neglected to bring their own fluids could hydrate themselves while they operated the corn roaster, but Barlow, being the only one operating the corn roaster, ended up consuming all the water and Gatorade himself. The HCC director in charge of assigning the picnic volunteers never came to the corn roasting station to ask if Barlow needed assistance during the three hours that he operated the corn roaster. According to Barlow, the director later said that she "had simply forgotten about" him at the picnic and therefore had never sent any volunteers to take over the corn roasting operation. The director denied making that statement but acknowledged that she never had any expectation

4

that Barlow would operate the corn roaster for three hours at the picnic and stated that she expected volunteers to assist him with the corn roasting.

After he finished roasting all 1,600 ears of corn, Barlow turned off the corn roaster. When the corn roaster had cooled to a safe temperature, he began to walk to the main tent area where food was being served and, as he was walking to the main tent area, he suddenly fainted and collapsed. Before collapsing, he exhibited no symptoms that would have served as a warning that he was about to faint. Barlow has no recollection of his fall. After he regained consciousness, people gathered around and attempted to help him. One person retrieved a bottle of Gatorade for Barlow. After drinking the Gatorade, Barlow walked over to the main tent and ate a plate of food. While eating, Barlow began to experience pain in his right shoulder area. He went back to his truck and, using predominantly his left hand, disassembled the corn roaster and loaded it back into his truck with the aid of another person.

Barlow left the picnic, intending to return the corn roaster, but he instead drove home because he felt faint and dizzy while driving and was still in pain. When he arrived at his home, he called his wife and told her that he could not get out of his truck because he was in too much pain and that he needed to go to the hospital. Barlow went to the hospital, where a doctor informed him that he had suffered a heat stroke due to severe dehydration. Barlow was diagnosed with a rotator cuff injury in his right shoulder and ultimately had shoulder surgery.

Barlow sued HCC for negligence. After discovery, HCC moved for summary judgment, which the district court granted. This appeal follows.

**D E C I S I O N**

On appeal from summary judgment, we review de novo whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76–77 (Minn. 2002). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *Id.* Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03.

To maintain a claim of negligence, a plaintiff must prove the following elements: "(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) that the breach of the duty was a proximate cause of the injury." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177 (Minn. 2014). "A defendant is entitled to summary judgment as a matter of law when the record reflects a complete lack of proof on an essential element of the plaintiff's claim." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). Here, the district court granted summary judgment for HCC because it concluded that "[t]he record in this case shows a lack of proof as to the essential element of duty."

"Generally, the existence of a legal duty is an issue for the court to determine as a matter of law." *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn. 1985). "A volunteer is one who does or undertakes to do that which he is not legally or morally bound to do." *White v. Great N. Ry. Co.*, 142 Minn. 50, 53, 170 N.W. 849, 850 (1919). When a volunteer undertakes to do a task, "he does so at his own risk." *Id.* at 53, 170 N.W. at 851. "To one

6

who is a volunteer, properly speaking, even if assisting in the master's work at the request of a servant, no affirmative duty to exercise care is due originally, but only after knowledge of peril." *Kelly v. Tyra*, 103 Minn. 176, 179–80, 114 N.W. 750, 752 (1908); *see also Evarts v. St. Paul, Minneapolis & Man. Ry. Co.*, 56 Minn. 141, 147, 57 N.W. 459, 460 (1894) ("[I]f, after discovering such volunteer has placed himself in a position of danger, even through his own negligence, the servants fail to exercise reasonable care to avert the danger, the master will be liable.").

A defendant also owes a duty "when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Brandon*, 845 N.W.2d at 178 (emphasis omitted) (quotation omitted). In close cases, foreseeability in the context of duty is a question for the jury, but when a case does not present a close question of foreseeability, the district court may decide the issue as a matter of law. *Id.* at 178 n.2. In order for the risk of the plaintiff's injury to be foreseeable, it must be objectively reasonable to expect, not merely conceivably possible. *Id.* at 178. "If the connection between the danger and the defendant's own conduct is too remote, there is no duty." *Id.*

The district court concluded that "[t]here is no evidence in the record to support a finding that [HCC] had knowledge of the specific risks involved in this case." The district court concluded that Barlow, as a volunteer with experience in operating the corn roaster, "assumed the ordinary and obvious risks of working with the corn roaster," and HCC therefore owed him no duty. The district court further determined that the risk of Barlow's heat stroke or shoulder injury was not foreseeable to HCC when it moved the corn roaster to the new location with no shade. Barlow admitted that he fell suddenly, exhibiting no

7

symptoms warning him of an impending collapse. The district court concluded that, if Barlow himself did not expect any harm before collapsing, HCC could not have expected any risk of harm.

We agree with the district court's reasoning. Critically, Barlow was a volunteer to whom HCC owed no duty. Barlow argues that he "did not 'volunteer' to operate the corn roaster for three-plus hours in an un-shaded area amongst picnic patrons" and that HCC should have known that Barlow would be placed in danger by operating the corn roaster by himself for an extended period of time due to HCC's failure to provide the promised volunteers. Barlow is correct that he initially volunteered to supervise other volunteers who would be roasting the corn and that he would only assist in the corn roasting as needed. But, by subsequently taking on the corn roasting duties himself after no volunteers showed up to roast the corn, he extended the scope of his volunteering because he undertook to do something that he was "not legally or morally bound to do." *White*, 142 Minn. at 53, 170 N.W. at 850. By continuing to operate the corn roaster in that capacity, he did so "at his own risk." *Id.* at 53, 170 N.W. at 851.

Barlow argues that his heat stroke caused by dehydration "should have been foreseeable to HCC given that a [67]-year-old obese man with diabetes was forced to continually operate the corn roaster when the HCC-designated volunteers failed to show up." But, Barlow never informed HCC of any health issues that would impact his ability to perform his volunteer duties at the picnic, so HCC could not have known that he was any more likely to suffer a heat stroke while operating the corn roaster than anybody else. Moreover, Barlow was, for all intents and purposes, an expert in operating the corn roaster,

8

having operated the machine at numerous prior picnics, and even he appeared not to recognize any danger in operating the corn roaster, exhibited no symptoms that could have warned him of his impending collapse, and never experienced health problems at prior picnics. If Barlow himself could not foresee the risk of collapsing from heat stroke after operating the corn roaster, the danger was not so obvious as to put HCC on notice of the risk of Barlow's injuries. It was not objectively reasonable to expect that Barlow would suffer a heat stroke, collapse, and injure his shoulder due to HCC's failure to send the anticipated volunteers to the corn roaster. Barlow, having assumed the risk of roasting corn by volunteering to roast all 1,600 ears and having suffered an injury that could not be foreseen by HCC's failure to send other volunteers to the corn roaster, was therefore owed no duty by HCC. Because Barlow cannot establish this essential element of a negligence claim, summary judgment for HCC was appropriate.

Barlow also argues that the district court erred by resolving factual disputes in favor of HCC. In deciding a motion for summary judgment, the district court must view the evidence in the light most favorable to the nonmoving party. *Ahlm v. Rooney*, 274 Minn. 259, 262, 143 N.W.2d 65, 68 (1966). The relevant facts for purposes of summary judgment are material facts. *See* Minn. R. Civ. P. 56.03. "A fact is material if its resolution will affect the outcome of a case." *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn. 1996). The factual matters that Barlow identifies have no impact on the analysis of the essential element of HCC's duty. We have viewed the evidence in the

light most favorable to Barlow, and we conclude that the district court did not err in determining that there are no genuine issues of material fact concerning HCC's duty.

**Affirmed.**