Germaine F. HARMON, Relator,

v.

COMMISSIONER OF REVENUE,
Respondent.

A16-0973

Supreme Court of Minnesota.

Filed: May 3, 2017

Eric Johnson, Saint Paul, Minnesota, for relator.

Lori Swanson, Attorney General, Kathryn M. Woodruff, Assistant Attorney General, Saint Paul, Minnesota, for respondent.

## OPINION

ANDERSON, Justice.

After the foreclosure of mortgage debt on a real-estate investment property triggered taxable gains to the investors, respondent Commissioner of Revenue requested that appellant Germaine Harmon file a 2010 Minnesota income-tax return. Three years later, Harmon still had not filed a return. Accordingly, the Commissioner assessed Harmon's 2010 Minnesota income-tax liability based on a Schedule K-1 filed by the partnership in charge of the foreclosed real-estate investment. Harmon appealed to the tax court, challenging the Commissioner's assessment. On cross mo-

tions for summary judgment, the tax court granted summary judgment in favor of the Commissioner. We affirm.

## FACTS

This tax dispute arises out of a failed real-estate investment that resulted in substantial tax consequences for the widow of one of the original investors. The trail leading to those consequences began in May 1984, when a group of general partners at Goldman Sachs formed City Center Investors (CCI), a real estate partnership. CCI's sole investment was a 49.475% proportional share in a parent partnership, City Center Associates (CCA). CCA's only asset was the City Center building (City Center), a mixed-use office and retail property in downtown Minneapolis. Because City Center was located in Minneapolis, all income flowing from the investment, and therefore from CCA, was generated in Minnesota. Harmon, the widow of one of the initial investors, acquired her husband's share of CCI upon his death in 1997.

City Center was encumbered by two mortgage loans. One was a purchase-money mortgage, used by CCA to purchase the building, and another was an underlying non-recourse first mortgage. By 2007, due to various factors including depreciation, interest, and anemic rental revenue, the principal balance of the mortgage loans exceeded the market value of City Center.

In January 2007, CCI issued a memorandum to its partners, including Harmon, outlining CCI's financial situation. The memorandum warned that because the amount of mortgage debt from the two mortgage loans encumbering City Center exceeded the value of the property, a foreclosure sale would "trigger a taxable gain to the partners of CCI."[1] Therefore, CCI

---

1. Gross income includes income from a "dis-   charge of indebtedness." I.R.C. § 61(a)(12)

warned its partners of a "significant 'built-in' tax gain to be realized upon foreclosure" of either mortgage loan, amounting to each partner's "allocable share of the outstanding balance of the [mortgage loan], including all accrued and unpaid interest over the years."

In December 2007, CCI issued another memorandum to its partners, including Harmon, indicating that after consulting with an attorney and accountant, no "fruitful" options were available for the City Center investment. The memorandum concluded that "the most likely outcome is that a triggering event . . . will result in a taxable gain to you" upon foreclosure of either of the mortgage loans encumbering City Center. At that time, CCI offered its partners an option to resign from CCI for a $1 cash buyout from the partnership. A resignation from CCI would still trigger the taxable gain, but at a time controlled by the resigning partner. Harmon did not take advantage of this early triggering opportunity to resign from CCI. But, because various other partners took advantage of the opportunity to resign, Harmon's proportional share in CCI increased from 1.446% in 2007 to 9.3025% in 2010, the taxable year at issue.

In 2010, one of the mortgage loans encumbering City Center was foreclosed, triggering the predicted taxable gain for its investors. After the foreclosure sale of its sole asset, CCA issued its final Schedule K-1 to its partners, including CCI.[2] The Schedule K-1 issued by CCA reported that CCI's share of taxable gains included $512 million in section 1231 gains and $149 million in section 1250 gains.[3] CCI, however, disputed the taxable gains listed on the Schedule K-1 from CCA. Instead, CCI determined that its section 1231 gains were $105 million and its section 1250 gains were $27.5 million. CCI listed its own calculations of the taxable gains in a report to the IRS[4] and issued to its partners, including Harmon, a Schedule K-1 reflecting CCI's calculation of the gains.

Harmon received a Schedule K-1 from CCI that listed her proportional share in the partnership at 9.3025% in 2010. Based

(2012); *see* I.R.C. § 63(a) (2012) ("[T]axable income means gross income minus deductions allowed by this chapter."); Minn. Stat. § 290.01, subd. 19 (2016) (defining "net income" as "federal taxable income").

**2.** Partnerships, unlike partners, do not pay income tax. I.R.C. § 701 (2012). The IRS, however, still requires partnerships (e.g., CCA and CCI) to file "informational returns," reporting the partnership's income, losses, and dividends. I.R.C. § 6031(a)-(b) (2012). Each partnership must also issue an annual Schedule K-1 to each of its partners, detailing each respective partner's proportional share of income, losses, and dividends. *Id.*

**3.** When you dispose of business property, your taxable gain or loss is usually a section 1231 gain or loss. . . . When you dispose of depreciable property (section . . . 1250 property) at a gain, you may have to recognize all or part of the gain as ordinary income under the depreciation recapture rules [of section 1250]. Any remaining gain is a section 1231 gain.

Internal Revenue Service, *Ordinary or Capital Gain or Loss for Business Property*, https://irs.gov/publications/p544/ch03.html; *see* I.R.C. §§ 1231, 1250 (2012).

**4.** Partners must report their individual income to the IRS using the information listed on the partnership's annually issued Schedule K-1. *See* I.R.C. §§ 701, 702(a), (c), 6221–22 (2012). When a partner's filing is inconsistent with the partnership's Schedule K-1, the IRS automatically amends the partner's returns. I.R.C. §§ 6221–6233; Treas. Reg. § 301.6222(b)-2 (2012). If a partner disputes the partnership's calculations and wants to file inconsistently, the partner must file a Form 8082 (Notice of Inconsistent Treatment) with the inconsistent return. Treas. Reg. § 301.6222(b)-1 (2012). CCI filed a Form 8082 with the IRS when it filed inconsistently with CCA on its own returns.

on CCI's calculations of its taxable gains, its Schedule K-1 listed Harmon's share as $9,781,486 in section 1231 gains and $2,559,468 in section 1250 gains. Harmon did not file a Minnesota income-tax return for 2010, despite having received the Schedule K-1 from CCI listing taxable gains from the foreclosure sale of City Center. Harmon believed that her carryover passive-activity losses from prior years would offset any taxable gains from the foreclosure. *See Billion v. Comm'r of Revenue*, 827 N.W.2d 773, 775 (Minn. 2013) ("[A] taxpayer may carry over a 'passive activity loss' to offset income earned from passive activities in future tax years.").

The Commissioner became aware of the City Center foreclosure and the taxable gains to Harmon when CCI filed its Minnesota returns. In December 2011, the Commissioner first requested that Harmon file a 2010 Minnesota income-tax return. Harmon, through her accountant, indicated to the Commissioner that she was processing the 2010 tax return and that she intended to provide federal returns to establish that her passive-activity losses from prior years offset the taxable gains from the City Center foreclosure. The Commissioner requested five additional times that Harmon file a 2010 Minnesota income-tax return but received no response.

By 2013, the Commissioner had not received Harmon's 2010 Minnesota income-tax return. In August 2013, the Commissioner issued an order assessing Harmon's tax liability based on CCI's returns, including its Form 8082 and Form 1065, which was consistent with the Schedule K-1 provided to Harmon by CCI. *See* Minn. Stat. § 270C.33, subd. 4(a)(2) (2016) ("The commissioner may issue an order of assessment ... [when] no return has been filed and the commissioner determines the amount of tax that should have been as-

sessed."). In the Commissioner's assessment of Harmon's income-tax liability, the Commissioner did not factor in all of Harmon's alleged passive-activity losses that may have offset her taxable gain in 2010 because Harmon had not filed a federal tax return since 2008 from which those passive-activity losses could be reliably calculated. The Commissioner calculated Harmon's 2010 Minnesota income-tax liability as $1,058,601.21, which included the tax on the 2010 gain, as well as a late fee and penalties.

Harmon administratively appealed the Commissioner's assessment, and the Commissioner amended the calculation of Harmon's income-tax liability to include the offsetting passive-activity losses from 2008, 2009, and 2010, based on the CCI-issued Schedule K-1s from those years. Further, the Commissioner eliminated one of the penalties that had been originally assessed. The amendment reduced Harmon's income-tax liability to $591,581.57, including interest and penalties.

Harmon appealed to the tax court, asking it to "overturn" the Commissioner's assessment of income-tax liability. On appeal, she asserted two central claims. First, she claimed that the conflicting calculations in the CCA-issued Schedule K-1 and the CCI-issued Schedule K-1 created a dispute that needed to be settled at the federal level before the Commissioner could assess Harmon's 2010 Minnesota income-tax liability. Second, Harmon argued that the CCI-issued Schedule K-1 for 2010 was not accurate evidence of her taxable income allowing the Commissioner to reliably assess her income-tax liability. During discovery, Harmon provided no documentation to show a different calculation of the taxable gains or her income-tax liability. She did provide, however, the following documentation: her federal income-tax returns, the memoranda issued to her by

CCI warning of a potential taxable gain, documentation of the testamentary trust through which she inherited her husband's interest in CCI, income-tax returns filed on behalf of the testamentary trust, her husband's estate tax return, and most notably, the Schedule K-1s issued to her by CCI for 1996, 2000, and 2002 through 2010.

Following discovery, the parties filed cross-motions for summary judgment. Two days before filing for summary judgment, in 2015, Harmon filed her 2010 federal tax return with the IRS and provided copies to the tax court and Commissioner.

The tax court granted the Commissioner's motion for summary judgment and denied Harmon's, affirming the Commissioner's assessment in its entirety. *Harmon v. Comm'r of Revenue*, No. 8760-R, 2016 WL 1730731, at *7 (Minn. T.C. Apr. 21, 2016). The tax court reasoned that the dispute between the Schedule K-1s from CCA and CCI had been settled in CCI's favor when the IRS did not take action on the inconsistency within the 3-year time period provided by statute. *Id.* at *5. Therefore, the tax court found that there was no existing federal dispute requiring it to vacate the Commissioner's assessment, as Harmon had requested.

Regarding Harmon's direct challenge to the assessment, the tax court applied Minnesota's presumption of validity to the Commissioner's assessment and declined to shift the burden to the Commissioner to prove the validity of the assessment, as Harmon contended is required in federal courts. *Id.* at *6. After declining to shift the burden, the tax court determined that Harmon had not overcome the presumption or identified a genuine issue of material fact regarding the accuracy of the assessment. *Id.* at *5. The tax court also noted that it could not "say, on this record, that Ms. Harmon would have satisfied [the federal] requirements." *Id.* at *6. Finally,

the tax court explained that, under Minnesota law, informational statements, such as the Schedule K-1 used by the Commissioner, can be relied on to assess an individual's tax liability, especially in the absence of other evidence. *Id.* at *7. Harmon petitioned this court for a writ of certiorari, disputing "the Tax Court's decision in its entirety."

## ANALYSIS

Harmon seeks review of the tax court's grant of summary judgment in favor of the Commissioner. "On appeal from summary judgment, this court reviews de novo whether there are any genuine issues of material fact and whether the district court erred in its application of the law to the facts." *Commerce Bank v. West Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015) (citing *STAR Ctrs., Inc. v. Faegre & Benson, LLP*, 644 N.W.2d 72, 76-77 (Minn. 2002)). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *Id.*

The Commissioner's assessment of tax liability enjoys a presumption of validity. *Conga Corp. v. Comm'r of Revenue*, 868 N.W.2d 41, 53 (Minn. 2015); *see* Minn. Stat. § 271.06, subd. 6 (2016) ("[T]he order of the commissioner or the appropriate unit of government in every case shall be prima facie valid."). This presumption places the burden on the taxpayer to produce evidence to rebut the presumption. *Conga Corp.*, 868 N.W.2d at 53. If a taxpayer provides "substantial evidence" that the Commissioner's assessment is incorrect, the presumption is overcome and the case is decided as if the presumption never existed, although the taxpayer retains the burden of proof throughout the proceeding. *Id.*

### I.

Harmon first contends that the Schedule K-1 is not sufficient evidence on

which to base an income-tax-liability assessment. Harmon concedes that the Commissioner's assessment enjoys a "presumption of correctness" under Minnesota law. She nevertheless asks us to impose a "limit" on that presumption. She contends that some federal courts require an income-tax assessment to be more than a mere "naked assessment" and that the Commissioner's sole reliance on only the Schedule K-1 is the type of "naked assessment" rejected by those federal courts. *See, e.g., United States v. Janis*, 428 U.S. 433, 442, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) ("[T]he debate does not extend to the situation where the assessment is shown to be naked and without *any* foundation."); *Portillo v. Comm'r*, 932 F.2d 1128, 1133 (5th Cir. 1991) ("As the Supreme Court has held, the presumption of correctness does not apply when the government's assessment falls within a narrow but important category of a naked assessment without any foundation whatsoever...." (quoting *Janis*, 428 U.S. at 442, 96 S.Ct. 3021) (internal quotation marks omitted)).

Implicit in Harmon's request for us to apply federal law is an acknowledgement that her argument would fail under Minnesota's presumption of validity. We agree that, given the presumptive validity of the Commissioner's assessment, she cannot prevail based solely on Minnesota law. Harmon notes that the Schedule K-1 is unsigned and undated, and the Commissioner admits that "the Minnesota Department of Revenue does not possess materials 'substantiating or supporting' the K-1 issued to [Harmon] for the tax year 2010." Under Minnesota law, however, the lack of support for the validity of the K-1 is not alone sufficient to rebut the presumption of validity. *See* Minn. Stat. § 270C.33, subd. 6 ("A return or assessment of tax made by the commissioner is prima facie correct and valid. The taxpayer has the burden of establishing its incorrectness or

invalidity in any related action or proceeding."); Minn. Stat. § 271.06, subd. 6; *Conga Corp.*, 868 N.W.2d at 53 ("The Commissioner's order or determination is 'prima facie valid,' and is *dispositive* in the absence of evidence *rebutting* it." (emphasis added)); *S. Minn. Beet Sugar Coop v. Cty. of Renville*, 737 N.W.2d 545, 558 (Minn. 2007) ("[A] prima facie case simply means one that *prevails in the absence of evidence invalidating it.*" (emphasis added) (quoting *Tousignant v. St. Louis Cty.*, 615 N.W.2d 53, 59 (Minn. 2000))). Rather, Harmon bears the burden of first providing "substantial evidence" of an inaccuracy to rebut the assessment's prima facie validity, and second, establishing an alternative calculation. *See Conga Corp.*, 868 N.W.2d at 53. Here, Harmon has done neither.

First, she has provided no evidence to rebut the prima facie validity of the Commissioner's assessment. In fact, during discovery, Harmon provided evidence from her own records—her copies of the Schedule K-1s from CCI—that support the Commissioner's reliance on the taxable-gain calculations in CCI's returns. Moreover, Harmon's argument is not based on the assertion that the Schedule K-1 is inaccurate. Instead, she appears to rely on the assertion that the Commissioner cannot prove that it *is* accurate, which alone cannot rebut the presumptive accuracy of the Commissioner's assessment. *See S. Minn. Beet Sugar Coop*, 737 N.W.2d at 558 ("[I]t is evident that merely showing up [to court] will not defeat the prima facie validity of an assessment. Rather, as our cases make clear, in order to defeat the prima facie validity of the assessment, the taxpayer must *offer evidence to invalidate* the assessment." (emphasis added)). Even if Harmon were disputing the accuracy of the Schedule K-1, however, mere conclusory statements in affidavits are not sufficient to create a genuine dispute of materi-

al fact for trial. *See State Farm Fire & Cas. v. Aquila Inc.*, 718 N.W.2d 879, 886 (Minn. 2006) ("We have held that, upon a motion for summary judgment, an adverse party cannot preserve a right to trial on the merits merely by referring to 'unverified or conclusory allegations' in the pleadings or by speculating about evidence that may be developed at trial." (citing *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995))).

Second, Harmon has not provided any alternative calculations of her 2010 taxable gains or Minnesota income-tax liability. Rather, she appears to simply assert that the Commissioner must ignore the 2010 taxable gains listed on CCI's return as well as the Schedule K-1 provided by Harmon. These bare assertions are insufficient to overcome the presumption of validity.

When we apply Minnesota law, it is clear that the tax court did not err by finding that Harmon had not met her burden of overcoming the prima facie validity of the Commissioner's assessment and in granting judgment as a matter of law to the Commissioner. We also reject Harmon's invitation to adopt the "naked assessment" limitation applied by some federal courts because it is inconsistent with Minnesota's statutory grant of presumptive validity to the Commissioner's assessment.

## II.

■ We turn next to Harmon's contention that the tax court erred by declining

to vacate the Commissioner's assessment due to the possibility of an alleged federal dispute over the proper calculation of Harmon's taxable gains. As she did before the tax court, Harmon argues that the inconsistency between the calculated gains in CCA's and CCI's Schedule K-1s demonstrated the existence of a dispute that must be resolved at the federal level before Harmon's Minnesota income-tax liability can be determined. She contends that the only proper remedy is to vacate the Commissioner's order pending federal resolution of the issue.[5] The tax court rejected this argument, determining that there was no pending federal dispute and that the Commissioner was entitled to judgment as a matter of law. We agree with the tax court.

Both the Commissioner and Harmon acknowledge that the IRS has 3 years from the filing of inconsistent tax returns to investigate a partnership-level dispute regarding the calculation of income-tax liability, such as the one between CCA and CCI. *See* I.R.C. § 6229(a) (2012) (establishing a 3-year window for the IRS to assess taxes attributable to a partnership item); Treas. Reg. § 301.6222(b)-2(a)(1)-(2) (2012) (requiring the IRS, upon a partner's inconsistent treatment of a partnership item, to honor the inconsistency, "conduct[ ] a partnership-level proceeding," or notify the partner of alternative treatment). Harmon argues that this 3-year period began when she filed her 2010 fed-

---

5. Harmon framed this argument, both before the tax court and before us, as seeking dismissal on the ground of *forum non conveniens*, a doctrine that allows a court to "decline jurisdiction over a cause of action when another forum would be more convenient." *Paulownia Plantations de Panama Corp. v. Rajamannan*, 793 N.W.2d 128, 133 (Minn. 2009). Like the tax court, we construe this request as one to vacate the Commissioner's order pending federal determination of any

dispute between CCA's and CCI's calculation of taxable gains. As the tax court noted, a "dismissal" of Harmon's appeal to the tax court would have the effect of leaving the Commissioner's assessment intact, and we conclude that it is doubtful that Harmon seeks that remedy. In addition, a pure *forum non conveniens* argument is unavailing because Harmon herself initiated the appeal in the tax court challenging the Commissioner's assessment.

eral returns in December 2015. The Commissioner, by contrast, asserts that this 3-year period began in 2011 when CCI filed its returns. We agree with the Commissioner.

Harmon asserts that the difference between CCA's taxable-gain calculation and CCI's taxable-gain calculation must be resolved at the federal level before the Commissioner can determine a Minnesota tax liability. However, this partnership-level dispute about CCI's informational returns is subject to the 3-year window for the IRS to act on an inconsistency, a claim that arose, at the latest, when CCI filed its Form 8082 in 2011. *See* I.R.C. §§ 6229(a), 6501(a); Treas. Reg. § 301.6222(b)-2(a)(1). The window for challenging CCI's treatment of the taxable gains in its Form 8082 has closed. Harmon has made no showing that she asserts that *her* separate calculation differs from *CCI's* because she did not file a form 8082 with the IRS and represented to the tax court that she has no intention of doing so. Therefore, the tax court did not err by concluding that there was no active federal dispute that needed to be resolved before the Commissioner could assess Harmon's Minnesota tax liability.[6]

## CONCLUSION

For the foregoing reasons, we affirm the decision of the tax court.

Affirmed.

---

[6] Last, Harmon asks us to remand to the tax court to re-determine the penalties that were not removed during the administrative appeal (only the penalty for substantial understatement of tax liability was removed). Because Harmon did not raise a challenge to the penalties with the tax court, this claim has been forfeited. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn. 1988).